STATE of Wisconsin, Plaintiff-Appellant,

v.

Ernest M. HANSON, Defendant-Respondent-Petitioner.

Supreme Court

*No. 79–568–CR. Argued February 10, 1981.*
*—Decided March 3, 1981.*

(Also reported in 302 N.W.2d 452.)

For the petitioner there were briefs by *Timothy R. Young,* and *Dempsey, Magnusen, Williamson & Lampe* of Oshkosh, and oral argument by *Mr. Young.*

For the appellant the cause was argued by *Pamela Magee-Heilprin,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM G. CALLOW, J.    This is a review of a decision of the court of appeals which reversed an order of the circuit court for Winnebago county, Hon. Edmund P. Arpin, circuit judge, discharging Ernest Hanson (the defendant) from commitment under Chapter 975, Stats. 1975, the Wisconsin Sex Crimes Act.[1] Hanson, convicted of rape in 1975, petitioned the trial court for an order of discharge pursuant to sec. 975.09, Stats. 1975,[2] after the Department of Health and Social Services had failed to conduct a periodic examination in accordance with the terms of that section. At the hearing scheduled in response to the defendant's petition, the trial court decided

---

[1] Chapter 975 was substantially amended by Chapter 117, Laws of 1979. Sec. 975.01, Stats., was repealed and recreated to provide that no more commitments could be made pursuant to this chapter after July 1, 1980.

[2] Sec. 975.09, Stats. 1975, provides:

"975.09 **Periodic examination.** The department shall make periodic examinations of all persons within its control under s. 975.06 for the purpose of determining whether existing orders and dispositions in individual cases should be modified or continued in force. These examinations may be made as frequently as the department considers desirable and shall be made with respect to every person at intervals not exceeding one year. The department shall keep written records of all examinations and of conclusions predicated thereon, and of all orders concerning the disposition or treatment of every person under its control. Failure of the department to examine a person committed to it or to make periodic examination shall not entitle him to a discharge from the control of the department, but shall entitle him to petition the committing court for an order of discharge, and the court shall discharge him unless it appears in accordance with s. 975.13 that there is necessity for further control."

that the state was required to prove beyond a reasonable doubt that further departmental control of the defendant was necessary. Following the hearing held on March 14, 1979, the court held that the state had failed to carry its burden and ordered the defendant discharged. The state's request for a stay of the order of discharge was denied, and an order discharging Hanson was entered on March 19, 1979.

The state appealed the order of discharge on the grounds that the trial court had improperly placed the burden of proof upon the state instead of the defendant and had improperly required proof beyond a reasonable doubt instead of by a preponderance of the evidence. The court of appeals held that the burden of proof was properly placed with the state but that the standard of proof should have been the lower civil burden—the preponderance of the evidence rather than the criminal standard of beyond a reasonable doubt. The order was reversed and the cause remanded for a new hearing. *State v. Hanson*, 98 Wis.2d 80, 295 N.W.2d 209 (Ct. App. 1980). Before this court the defendant contends that the court of appeals erred in reversing the trial court on the standard of proof and, in addition, raises issues relative to the propriety of the court of appeals' disposition of the case and the sufficiency of the evidence at the March 14 hearing. The state seeks to review the court of appeals' determination on the allocation of the burden of proof, thereby raising other issues relating to appellate procedure. We accepted the review in order to determine the correct standard of proof to be employed in sec. 975.09, Stats. 1975, hearings, and we affirm.

I.

The primary issues presented on this review require that we first attempt to unravel some of the intricacies

of the 1975 version of Chapter 975, Stats. Following initial commitment to the Department of Health and Social Services, the duration of departmental control over a committed person is regulated by a variety of factors. As a general matter the department is required to discharge a person as soon as, in its opinion, the person can be discharged without danger to the public. Sec. 975.11, Stats. 1975.[3] Discharge is required by sec. 975.12, Stats. 1975,[4] after the expiration of the maximum period for which the person could have been sentenced under the law, which also provides for parole release by applying

---

[3] Sec. 975.11, Stats. 1975, provides:

"975.11 **Duration of control.** The department shall keep every person committed to it under s. 975.06 under its control and shall retain him, subject to the limitations of s. 975.12 under supervision and control, so long as in its judgment such control is necessary for the protection of the public. The department shall discharge any such person as soon as in its opinion there is reasonable probability that he can be given full liberty without danger to the public, but no person convicted of a felony shall, without the written approval of the committing court, be discharged prior to 2 years after the date of his commitment."

[4] Sec. 975.12, Stats. 1975, provides:

"975.12. **Termination of control.** (1) Every person committed to the department under this chapter who has not been discharged as provided herein shall be discharged at the expiration of one year or the expiration of the maximum term prescribed by the law for the offense for which he was committed subject to sub. (2) whichever is greater, unless the department shall have acted under s. 975.13 to continue him subject to its control. For the purpose of this subsection, sentence shall begin at noon of the day of the commitment by the court to the department.

"(2) All commitments under s. 975.06 for offenses committed after July 1, 1970, shall be subject to ss. 53.11 and 53.12. If the department is of the opinion that release on parole pursuant to s. 53.11(7)(a) would be dangerous to the public, it shall either make an order directing that the person remain subject to its control or make an order suspending the provisions of s. 53.11 (7)(a) and in either case shall make application to the committing court for a review of that order proceeding as provided in this chapter."

sentence diminution credits earned pursuant to secs. 53.11 and 53.12, Stats. *See: State v. Cramer,* 98 Wis.2d 416, 421–24, 296 N.W.2d 921 (1980). However, if the department believes that a person's release pursuant to sec. 975.12 would be dangerous to society, it can order a continuation of control beyond the maximum sentencing period under law and apply to a court for a confirming order. Secs. 975.13 and 975.14, Stats. 1975.[5] Thus under

[5] Secs. 975.13 and 975.14, Stats. 1975, provide:

"**975.13 Continuance of control; order and application for review by the committing court.** If the department is of the opinion that discharge of a person from its control at the time provided above would be dangerous to the public for reasons set forth in s. 975.14, it shall make an order directing that he remain subject to its control beyond that period; and shall make application to the committing court for a review of that order at least 90 days before the time of discharge stated."

"**975.14. Action of committing court upon application for review; reasons for continuance of control by the department.** (1) If the department applies to the committing court for the review of an order as provided in s. 975.13 the court shall notify the person whose liberty is involved, and, if the person is not sui juris, the person's parent or guardian as practicable, of the application, and shall afford the person opportunity to appear in court with counsel and of process to compel the attendance of witnesses and the production of evidence. The person may have a physician or clinical psychologist of the person's choosing examine the person and the medical records in the institution to which confined or at some suitable place designated by the department. If unable to provide counsel, the court shall appoint counsel to represent the person. Section 975.06(1) shall govern the procedure of the hearing.

"(2) If, after a hearing, it is found that discharge from the control of the department of the person to whom the order applies would be dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality the court shall confirm the order. If it is found that discharge from the control of the department would not be dangerous to the public for the causes stated, the court shall order that the person be discharged from the control of the department at the time stated in the original commitment."

Chapter 975, Stats. 1975, discharge from departmental control may occur before the expiration of the maximum sentence for the offense, at the expiration of such period, or after such period.

During the initial commitment period—that is, one not extended by operation of secs. 975.13 and 975.14, Stats. 1975—the department is required to conduct periodic examinations, at least annually, "for the purpose of determining whether existing orders and dispositions in individual cases should be modified or continued in force." Sec. 975.09, Stats. 1975. If, based upon one of these examinations, the department formulates the opinion that control of a person is no longer necessary, it must discharge the person pursuant to sec. 975.11, Stats. 1975. The standards for conducting such an examination were the subject of considerable judicial attention culminating in *State ex rel. Terry v. Percy*, 95 Wis.2d 476, 290 N.W.2d 713 (1980). If the department fails to conduct such an examination, the committed person is entitled to petition the court for an order of discharge under sec. 975.09, "and the court shall discharge him unless it appears in accordance with s. 975.13 that there is necessity for further control." Sec. 975.09. The reference to sec. 975.13 incorporates into this procedure the hearing procedures of sec. 975.14 and thus alters the ultimate inquiry concerning the person's eligibility for discharge. If the department initiates the examination and conducts it according to *Terry*, discharge would follow a departmental opinion, expressed in sec. 975.11, that "there is reasonable probability that he can be given full liberty without danger to the public"; but if the committed person petitions for an order of discharge, calling into play the judicial processes of secs. 975.13 and 975.14, discharge is predicated upon a finding (by the trial court) that "discharge from the control of the department . . . would [not] be dangerous to the public because of the person's mental or physical

deficiency, disorder or abnormality." Sec. 975.14(2), Stats. 1975.[6] It was in the context of this kind of hearing, and specifically with reference to this finding, that the state was held to proof beyond a reasonable doubt.

## (A)

The court of appeals, applying the factors set forth in *State v. McFarren,* 62 Wis.2d 492, 215 N.W.2d 459 (1974), concluded that the burden of proof properly had been placed upon the state. The state argues that, in reaching that conclusion, the court of appeals did not accord enough significance to the fact that in a sec. 975.09, Stats. 1975, petition-initiated hearing the committee is the one seeking discharge during what otherwise might be a lawful term of confinement. Analogizing to a parole

---

[6] Our analysis of this situation is borne out by the recent change in sec. 975.09, Stats. Chapter 117, Laws of 1979, repealed secs. 975.13 and 975.14 but created sec. 975.09(2) and (3) which is very similar in content to sec. 975.14 except that the procedures for such a hearing are now expressly controlled by sec. 975.06(1), Stats. 1979–80. Sec. 975.09(2) and (3), Stats. 1979–80, provides:

"(2) If the person petitions the court for discharge under sub. (1), the person may appear in court with counsel and compel the attendance of witnesses and the production of evidence. The person may have a physician or clinical psychologist of the person's choosing examine the person and the medical records in the institution to which confined or at some suitable place designated by the department. If unable to provide counsel, the court shall appoint counsel to represent the person. Section 975.06(1) governs the procedure of the hearing.

"(3) If, after a hearing, it is found that discharge from the control of the department of the person to whom the order applies would be dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality, the court shall dismiss the petition. If it is found that discharge from the control of the department would not be dangerous to the public for the causes stated, the court shall order that the person be discharged from the control of the department."

determination situation, the state observes "[n]o one would suggest that the state would have the burden of showing why a legal sentence of a committing court should not be vacated." Because the sec. 975.09 hearing occurs during the initial commitment period, the state claims the burden should be on the committee to establish entitlement to discharge.

The state's position rests too much on its perception of the initial commitment period as being the equivalent of a sentence. It is clear from the provisions of secs. 975.09 and 975.11, Stats. 1975, however, that an initial commitment is not self-perpetuating—it does not have the sustaining force or the finality characteristic of a normal sentence. Instead, the commitment must be reviewed by the department at least annually in order to determine the need for continuation or modification of the commitment and, pursuant to sec. 975.11, the committee's eligibility for discharge. This annual obligation to justify continued departmental control is placed by statute upon the department, and yet the state argues that, when the department fails to meet its statutory obligation, the committee must assume the laboring oar and prove that the state is not justified in continuing the commitment.

We do not believe the department's failure to conduct a periodic examination should work such a shift in the burden of going forward. The department's obligation to afford the committee an annual review of the commitment remains unaltered by its failure to do so in the manner prescribed in sec. 975.09, Stats. 1975, and the fact that the committee initiates the statutory alternative procedure as a consequence of the department's failure to act neither changes the basic nature of the determination nor thrusts upon the committee any added duty to carry the burden of proof. The court of appeals noted the possibilities for abuse were it otherwise, and we would

add only that the department should not benefit from its own inertia. We affirm the conclusion of the court of appeals that the burden of proof was properly allocated to the state.

## (B)

In holding the state to the high criminal standard of proof in demonstrating a need for further departmental control over the defendant in a sec. 975.09, Stats. 1975, hearing, the trial court relied upon the comments of the Jury Instruction Committee explaining the use of different standards of proof for initial commitments under sec. 975.06, Stats. 1975, and continuation of control hearings under sec. 975.14, Stats. 1975. Comments to Wis. J I—*Criminal* 1551–A and 1553 indicate the committee's view that the proper standard for initial commitments under sec. 975.06 should be "the general civil burden: 'to a reasonable certainty by evidence that is clear, satisfactory and convincing,' "[7] while the proper standard for continuation of control hearings under sec. 975.14 should be the high criminal standard of beyond a reasonable doubt. Comment 3 to Wis. J I—*Criminal* 1553 states:

"However, Wisconsin's new Mental Health Act, Chapter 430, Laws of 1975, provides for proof 'beyond a reasonable doubt' in all civil commitment proceedings [see sec. 51.20(12) and 51.20(14)(e)]. The Committee determined that it was not required to apply the 'beyond a reasonable doubt' standard to the issue of commitment under the Sex Crimes Law [that is, initial commitments], see discussion at note 6, Wis. JI—Criminal 1551–A, because the fact of the criminal conviction offered a

---

[7] We note that this characterization of the standard of proof misstates our holding in *Goetsch v. State*, 45 Wis.2d 285, 294, 172 N.W.2d 688 (1969), and *Syvock v. State*, 61 Wis.2d 411, 418–19, 213 N.W.2d 11 (1973), which clearly indicates the lower, as opposed to the middle, civil burden.

rational basis for using the less stringent burden of proof. But in the continuance of control situation, the defendant has served the sentence authorized by the criminal law and the effect of the criminal conviction in justifying departure from the procedure applicable to civil commitments is greatly diminished. The issue on continuance of control under the Sex Crimes Law is so similar to the issue on involuntary civil commitment that the Committee feels it would be a denial of equal protection to employ a different burden of proof."

This comment reflects the view of the Jury Instruction Committee that the standard of proof for a continuation of control hearing should be the same as for an involuntary commitment under sec. 51.20, Stats. 1975, since once the possible term of imprisonment for the offense expires, there is no underlying conviction to justify a lower standard.[8] The trial court viewed a sec. 975.09 discharge hearing initiated by a committee's petition to be more closely akin to a continuation of control situation than to an initial commitment situation and thus required the high standard recommended by the Jury Instruction Committee for continuation of control hearings. In addition, the trial court noted that, because of the reference to sec. 975.13 contained in sec. 975.09, the standard of proof utilized in sec. 975.13, Stats. 1975, proceedings should be used.

The defendant hinges his argument upon the existence of a protected liberty interest created by sec. 975.09, Stats., 1975, which requires the application of the high standard of proof. Relying heavily upon *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1 (1979), the defendant argues that, because sec. 975.09 provides that a person *shall* be discharged from control unless proven dangerous, it creates a liberty interest which gives rise

---

[8] The standard of proof in civil commitments was changed to proof by "clear and convincing evidence," by Chapter 336, Laws of 1979. *See: Addington v. Texas,* 441 U.S. 418 (1979).

to due process safeguards, including the right to be proven dangerous beyond a reasonable doubt.

In *Greenholtz* the court considered what process was due prison inmates upon consideration for discretionary parole under a Nebraska statute. Rejecting the inmates' reliance on *Morrissey v. Brewer,* 408 U.S. 471 (1972), in which the court established certain due process standards for a parole revocation determination, the court recognized the difference between losing a liberty one currently enjoys and being denied a conditional liberty one merely desires. More significantly, the court focused upon the nature of the inquiry to be made in a parole release determination:

"As we recognized in *Morrissey,* the parole-revocation determination actually requires two decisions: whether the parolee in fact acted in violation of one or more conditions of parole and whether the parolee should be recommitted either for his or society's benefit. *Id.,* at 479–480. 'The first step in a revocation decision thus involves a wholly retrospective factual question.' *Id.,* at 479.

"The parole-release decision, however, is more subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release. Unlike the revocation decision, there is no set of facts which, if shown, mandate a decision favorable to the individual. The parole determination, like a prisoner-transfer decision may be made

" 'for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate.' *Meachum v. Fano, supra,* at 225.

"The decision turns on a 'discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done.' Kadish, The Advocate and the Expert —Counsel in the Peno-Correctional Process, 45 Minn. L. Rev. 803, 813 (1961)." 442 U.S. at 9–10.

Based largely upon the subjectivity and predictive character of the determination to be made in the parole release determinations, the court refused to hold that the mere possibility of parole release gave rise to a constitutionally protected liberty interest. The inmates also argued, as does the defendant in this case, that the words of the statute themselves created a protected interest because of the direction that the parole board "shall order [the person's] release" unless it was of the opinion that parole release should be denied for any of four specified reasons. Although the court accepted the inmates' view that the statute provided an expectancy which was "entitled to some measure of constitutional protection," *Greenholtz,* 442 U.S. at 12, it emphasized the flexible character of due process standards and held that the due process protections provided by the parole board's procedures—an opportunity to be heard and, if parole is denied, notification of the reasons for denial—were sufficient, particularly in view of the nature of the determination as "essentially an experienced prediction based on a host of variables." *Id.* at 16. This court applied *Greenholtz's* minimum due process safeguards to a state-initiated periodic examination under sec. 975.09, Stats., 1975. *See: State ex rel. Terry v. Percy, supra.*

We do not see much in *Greenholtz* to support the defendant's argument. Although the character of the liberty possible under the statutes involved differs— parole liberty in *Greenholtz* as opposed to absolute discharge under sec. 975.09, Stats., 1975—the manner in which such liberty is secured is in both cases contingent upon a subjective determination heavily aligned toward predicting future behavior. The difficulty of making such predictions with a high degree of certainty was conceded by each of the witnesses testifying at the March 14 hearing. In *Terry* we described the nature of the interest

at stake in a sec. 975.09 hearing initiated by the department as follows:

"As in *Greenholtz,* the discharge from commitment with which we are concerned involves a denial to the committee of a conditional liberty which he desires, not a deprivation of liberty which he already has. Also, the decision to discharge a person from commitment is a discretionary decision which depends on numerous elements, some of which are factual, but many of which are subjective appraisals by the department. The decision to discharge may be made for several reasons and may involve nothing more than an informed prediction as to what would best serve to protect the public or promote the welfare of the sex offender. Thus, in accordance with *Greenholtz,* it is not necessary that there be a formal adversary hearing in order to determine whether the commitment should be continued." 95 Wis.2d at 481–82.

The nature of the liberty interest at stake in this case, where the sec. 975.09 hearing was initiated by the defendant instead of by the department, does not differ appreciably from that which we described in *Terry.* Possible discharge from departmental control lies at the end of the proceeding regardless of who initiates it, and whether the final evaluation is in the form of a departmental opinion or a trial court finding, it is nonetheless an assessment of the committed person's dangerousness based upon a variety of subjective appraisals. The involvement of judicial machinery is justified by the department's failure to conduct the periodic examination as it is required by statute, in order to accord committees the examinations to which they are entitled, but the essence of the procedure is still within the ambit of sec. 975.09—a periodic examination during the course of what could have been, but for the Chapter 975 commitment, a term of imprisonment for the underlying conviction.

The defendant, like the inmates in *Greenholtz,* argues that the words of sec. 975.09, Stats., 1975, create a liberty interest by providing that the court "shall discharge"

the defendant unless the requisite showing is made. The mandate to discharge is cast in the same terms as that contained in sec. 975.11, Stats., 1975, which is directed at the department rather than the court, and we believe the liberty interest created by such language is no greater in the one situation than in the other merely because one is directed to a court and one to the department, or because one is to be made following a judicial proceeding and the other under the standards set forth in *Terry.* Although neither *Greenholtz* nor *Terry* addressed a standard of proof issue, and thus cannot be viewed as dispositive of the matter here, the criminal standard requiring proof beyond a reasonable doubt would be inconsistent with the minimal due process standards called for by *Greenholtz* and *Terry;* and because we view the essential liberty interest to be the same in this case as in a *Terry-*type situation, we believe that such a standard is similarly inappropriate here.

■

The purpose of a standard of proof is to " 'instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Addington v. Texas,* 441 U.S. 418, 423 (1979). The standard of proof beyond a reasonable doubt, urged upon us by the defendant, has universally been associated with the criminal law and has been considered so fundamental to the criminal adjudicative process that it was not until *In Re Winship,* 397 U.S. 358, 364 (1970), that the United States Supreme Court expressly declared that standard to be mandated by principles of due process and fundamental fairness. So profound is our belief that one should not be erroneously convicted of a criminal offense that we embrace this very high requirement of fact-finding certitude despite the risk that some guilty persons may escape justice. *Patterson v. New York,* 432 U.S. 197, 208 (1977).

Different considerations are called into play where, as here, the fact-finding process is not directed toward determining a person's guilt or innocence of a criminal offense. Admittedly the inquiry mandated by sec. 975.09, Stats. 1975, would never have to be made but for a previous sex-related conviction, but the fact remains that the conviction has already been secured, and in that proceeding the defendant was protected by the high standard of proof required to produce a valid finding of guilt. In *Addington v. Texas, supra,* the court considered what standard of proof should apply to an involuntary civil commitment. While recognizing that the loss of liberty attendant to a civil commitment required certain due process protections, the court rejected the reasonable doubt standard for several reasons. First, the standard is traditionally reserved for criminal cases and should not casually be applied in civil areas. Second, in a commitment case the risk of erroneously committing a mentally normal person is in some measure minimized because "the layers of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected." 441 U.S. at 428–29. Third, unlike the corresponding sentiment in criminal cases, it is not necessarily true that "it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." *Id.* at 429. Finally, and most significantly in our view, the inquiry in a civil commitment case is not a retrospective determination of what actually happened as opposed to what was alleged to have happened, such as it is in a criminal case; instead, the inquiry is an amalgam of diagnostic interpretations and enlightened predictions designed to determine a person's dangerousness and need for treatment. In view of the subtleties of psychiatry, not only is it unlikely that psychiatric diagnoses could be rendered

beyond a reasonable doubt, but it would be unreasonable to expect a lay fact finder, based upon such diagnoses, to reach a level of certitude even greater than that of the expert opinions upon which its findings are to be based. *See, generally: Steele v. State,* 97 Wis.2d 72, 294 N.W. 2d 2 (1980). Moreover, to do so would risk undercutting a state's "efforts to further the legitimate interests of both the state and the patient that are served by civil commitments." *Addington,* 441 U.S. at 430.

We believe the rationale of *Addington* supports our view that the standard of proof in a sec. 975.09, Stats. 1975, hearing need not be beyond a reasonable doubt. Although the commitment follows a criminal conviction, at the sec. 975.09 stage it is far more analogous to a civil proceeding than it is to a criminal proceeding. Most important, the sort of inquiry to be made—the dangerousness of the person committed—similarly may not be capable of determination beyond a reasonable doubt owing to its predictive orientation. Requiring proof of dangerousness beyond a reasonable doubt would seriously risk impeding the effectuation of the purposes of the Sex Crimes Act, which we have frequently declared to be for the protection of society from dangerous sex deviates and the treatment of sex offenders. *State v. Hungerford,* 84 Wis.2d 236, 245, 267 N.W.2d 258 (1978); *State v. Torpy,* 52 Wis.2d 101, 111–12, 187 N.W.2d 858 (1971).

In *Addington* the court decided that a person facing involuntary civil commitment was entitled to more protection than offered by the lower civil standard of the greater weight of the credible evidence but was not entitled to the highest protection afforded by proof beyond a reasonable doubt. Accordingly, the court adopted the middle civil standard which coincides with the proof required by statute in this state. Sec. 51.20(13)(e), Stats. 1979–80. Although we find *Addington* persuasive in re-

jecting the defendant's claim that the proper standard of proof is beyond a reasonable doubt, we believe the circumstances of a sec. 975.09, Stats. 1975, hearing are sufficiently distinguishable from an ordinary involuntary civil commitment to justify applying the lower civil burden of the preponderance of the evidence in this case. We do not agree with the court of appeals that in a sec. 975.09 hearing the criminal conviction provides a continuing basis for commitment up to the expiration of the maximum period for which the offender might have been imprisoned. Under Chapter 975 the basis for continuing commitment is exclusively the dangerousness of the committed and the relative safety with which the committed person can be released into society. This is not to say, however, that the fact of the criminal conviction is to be ignored totally.

Chapter 975, Stats. 1975, attaches significance to the period to which a person might have been sentenced by allowing a purely administrative determination of dangerousness in a normal state-initiated sec. 975.09 proceeding during that time, while mandating judicial affirmation of continuation orders after the expiration of that time. Despite the shift to sec. 975.14, Stats. 1975, procedures because of the state's failure to administer the periodic examination, it remains nonetheless a determination made under sec. 975.09, Stats. 1975, before the expiration of the maximum incarceration period. Without passing upon the question of what standard of proof should apply to a hearing for a continuation of control beyond the maximum sentence period, we believe the fact that there has been a criminal conviction in a sex-related offense, coupled with the fact that but for commitment the offended could have faced a period of incarceration potentially extending beyond the time of the sec. 975.09 hearing, is ample justification for requiring proof of dangerousness by a preponderance of the evidence at

this stage of the commitment process. Just as we are mindful that societal interests would be too seriously implicated by requiring proof beyond a reasonable doubt, so too are we convinced that, in our determination of standards for the discharge of committed sex offenders, society is entitled to greater assurances of protection from those who, but for Chapter 975, might yet be in prison than from those who, had they been sentenced instead of committed, would have satisfied their debt to society and would be free. This greater assurance is provided by the lower civil standard of proof in a sec. 975.09 hearing, and we hold it to be the proper one.

## II.

The petitioner argues that, even if we affirm the court of appeals on the standard of proof issue, as we have, the proper disposition of the case is not to remand to the trial court for a new hearing but rather to remand to the trial court for a determination on the record, but employing the lower civil standard of proof. A new hearing, it is argued, permitting the state to introduce new evidence, would give the state "a second opportunity to litigate the case to the prejudice of the defendant." The state responds that a review on the record would not be satisfactory because the trial court, receiving the evidence initially with a different standard of proof in mind, would be influenced by perceptions made in light of that standard and that a new hearing is required to provide the court with an opportunity to view witnesses and assess credibility while mindful of the appropriate standard of proof.

There is much to be said for the state's argument. Once evidence has been tested by a trier of fact against a particular standard of proof and found wanting in persuasiveness, we do not believe it is realistic to expect

the same trier of fact to review the same evidence and recall observations of demeanor and credibility, wholly influenced by the previous appraisal. This practical difficulty alone would justify taking new proof upon rehearing. However, there is another consideration of even greater significance. The hearing which resulted in the defendant's discharge took place on March 14, 1979, and the defendant has been at large ever since. The proof in the record relates to the defendant's need for further departmental control as of that date. Since the Sex Crimes Act was designed to protect society from the dangers posed by sexual deviates, as well as to provide treatment for such persons, *State v. Hungerford,* 84 Wis.2d at 245; *Huebner v. State,* 33 Wis.2d 505, 521, 147 N.W.2d 646 (1967), we believe the determination of the defendant's need for further departmental control must be made as of the date of the rehearing pursuant to this review. The proof offered nearly two years ago may not necessarily be probative, but in any event the proof should not be limited so as to preclude any evidence of present dangerousness. We note that taking new evidence does not necessarily inure to the exclusive benefit of the state, as the defendant suggests. Presumably the defendant would be able to present evidence of his conduct during the past two years should it be considered helpful to his cause.

### III.

Finally, the defendant contends that, even under the lower standard of proof, the evidence adduced at the March 14, 1979, hearing was insufficient to support a finding that he was in need of further control by the department. It would be unwise for us to comment upon the sufficiency of the evidence adduced at the March 14

hearing because of the tendency such a ruling might have to influence subsequent determinations in the matter. Suffice it to say that we did not find the evidence so woefully inadequate as to foreclose the necessity for re-hearing.

*By the Court.*—The decision of the court of appeals is affirmed.

BEILFUSS, C. J., took no part.