STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Harold KOPUT, Defendant-Appellant.

Supreme Court

*No. 85–2244–CR. Argued September 9, 1987.—Decided February 11, 1988.*

(Also reported in 418 N.W.2d 804.)

371

For the plaintiff-respondent-petitioner the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Donna L. Hintze,* assistant state public defender.

HEFFERNAN, CHIEF JUSTICE. This case comes to us by a petition of the state to review a decision of the court of appeals[1] which reversed a judgment convicting Harold Koput (Koput) of first

[1]*State v. Harold Koput,* 134 Wis. 2d 195, 396 N.W.2d 773 (Ct. App. 1986).

degree murder. The appeal was from the judgment of the circuit court for Milwaukee county, Ralph G. Gorenstein, Circuit Judge.

The principal issue for which this court accepted this case on review was whether, in the second phase of a bifurcated criminal trial, the jury verdict must be unanimous in determining that a defendant who, in the first phase, had been found guilty of criminal conduct was to be exonerated from criminal responsibility[2] and whether, in the event of prejudicial error in the second phase of the trial, a completely new trial on all issues was required.

The court of appeals concluded that a unanimous verdict was required in the second phase of the bifurcated trial. Accordingly, it held that the verdict in which one juror concluded that Koput was not responsible for his conduct and eleven jurors did not so find was constitutionally defective for lack of unanimity.

The court of appeals reversed the circuit court's conviction and remanded the case for retrial on all issues, including a retrial on the first phase—the guilt issue.

---

[2]Sec. 971.15(1), Stats. The statute in full provides:

**971.15 Mental responsibility of defendant.** (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

(2) As used in this chapter, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

We hold that, because the responsibility phase of the bifurcated trial is not an integral part of the criminal trial, but is rather a special proceeding in the criminal process in which the defendant has the burden of proof to establish his lack of responsibility to a reasonable certainty by the greater weight of the credible evidence, a unanimous verdict is not required. We also hold that a verdict in which five-sixths of the jurors agree that the person found guilty of criminal conduct in phase one is not responsible will exonerate that person from criminal sanctions for the conduct.

Because we conclude that no prejudicial error occurred in the responsibility phase of the trial, we have no occasion, and are not required, to determine whether such an error would mandate a retrial of the entire case. We conclude, however, in the exercise of our supervisory authority over courts, that, where the error is only in the responsibility phase of the bifurcated trial, there is no reason whatsoever for concluding that there should be a retrial of the error-free, guilty determination. Only a retrial of the responsibility phase is appropriate.[3]

The defendant, upon our acceptance of the state's petition for review, in his brief raised an additional issue, decided adversely to him by the court of appeals—that the court of appeals erred when it affirmed the order of the trial court denying the

---

[3]While this review was pending, the legislature adopted 1987 Assembly Bill 73 as 1987 Wisconsin Act 86. This act repealed in toto Sec. 971.175 (*see* p. 382, n. 9), *Sequential order of proof,* which statutory provision was in effect at all times relevant to the disposition of the instant case and is referred to in this opinion. The newly created statute, effective November 27, 1987, will in future cases obviate the problems addressed in this opinion. The full text of the Act appears as Appendix A to the opinion.

suppression of certain inculpatory statements made by the defendant.[4] We conclude that the trial court correctly determined that defendant was not in custody before he gave the statement sought to be suppressed and, therefore, was not entitled to a *Miranda* warning and, for the same reason, had neither a right to counsel nor a right to silence that would be afforded to a person "in custody" undergoing interrogation.

Accordingly, we do not reach the basis justifying suppression utilized by the court of appeals, which assumed that the defendant was in custody but that his rights to counsel and to remain silent were not violated. We conclude, however, that the circuit court order denying defendant's motion to suppress was properly affirmed by the court of appeals, although we justify our affirmance on a rationale different from that utilized by the court of appeals.

We therefore reverse the court of appeals and, in effect, affirm the conviction of Harold Koput for first degree murder. We first discuss the question of whether the order denying suppression was correct and then consider the question of whether a jury verdict on phase two need be unanimous.

The record reveals the following uncontroverted facts, on the basis of which we determine that Koput

---

[4] *See, State v. Wyss,* 124 Wis. 2d 681, 690–91, 370 N.W.2d 745 (1985), explaining, on the basis of prior determinations of this court, that, "once a petition for review has been granted, this court has the power to examine all rulings of the circuit court to which objection was properly preserved and all conclusions reached by the court of appeals which are raised by the respondent's brief, to determine whether they are erroneous, and whether if corrected they would sustain the judgment or order of the circuit court or the decision rendered by the court of appeals."

was not in custody and therefore had no rights under *Miranda v. Arizona,* 384 U.S. 436 (1966).

On March 27, 1983, the stabbed, bludgeoned, and sexually mutilated body of Lucille Ann Nelson was found on the Milwaukee County Institution grounds. Because, despite the passage of several months, there were few, if any, leads concerning the killing, a television announcement was run on Milwaukee stations asking that anyone who had seen Lucille Ann about the time of the killing come forward. Motivated by this television announcement, on October 4, 1983, Koput went to a priest and gave information about having seen Nelson on the night in question. The content of the statement is not known. With Koput's consent, the priest called the Milwaukee police department. When the police arrived shortly thereafter, Koput gave a non-inculpatory oral statement that he had been with Nelson early on the evening she was murdered. The Milwaukee police determined that the murder took place in the territorial jurisdiction of the sheriff's department and notified that office. Koput was taken home by the Milwaukee police and was told that someone from the Milwaukee county sheriff's department would interview him. At about 12:45 A.M. on October 5, 1983, a sheriff's deputy visited Koput at his home, and there Koput reiterated the information given earlier in the evening to the Milwaukee police. At the conclusion of the interview, Koput told the sheriff's officers that he would be available for further interviews and could be reached the next day at his home until 9:30 A.M., after which time, he could be reached at work. Sheriff's deputies Smukowski and McVeigh met Koput at his workplace the next morning and, with his agreement, drove him to the sheriff's office. On the way Koput stated he needed cigarettes.

He was dropped off to make the purchase while the officers waited for him in their car.

Koput was directed to a records office, where the interview was conducted. The office was unguarded. The room had no door, and ingress and egress were unrestricted at all times. None of the officers interviewing Koput was in uniform, and the only one of them who was armed had his weapon concealed. No weapons were visible during the course of the interview. The record reveals no threats or accusation of crime. Koput was never restrained. The room had normal lighting—neither bright nor dim. He was invited to use the toilet facilities; and, although the officers accompanied him to those facilities when he wished to use them, the reasonable inference from the record is that this was only as an accommodation for the purpose of giving directions to Koput. He was given food and allowed to smoke. Whenever he indicated that he wished to be left alone, he was. There was testimony that, had he desired, he could have left at any time prior to giving his inculpatory statement.

However, about three hours after coming to the sheriff's office, Officer Smukowski, because of Koput's "fidgeting" and inconsistent statements, reached the subjective conclusion that Koput was a "suspect."

At about 2 P.M., Koput was read his "rights" in accordance with the *Miranda* procedure.[5] It was at

[5]When responding to a written question whether he wished to have an attorney, Koput wrote in the answer, "yes," but immediately he asked Smukowski whether he had to consult with an attorney, "now." Smukowski responded, "yes." While Smukowski's response was arguably incomplete, we conclude that whatever misstatement was made is irrelevant, because Koput was not in custody. Moreover, the balance of the form clearly stated that his election not to have a lawyer "now" did not foreclose him of the

this point Koput stated, in the presence of Deputies Smukowski and McVeigh, "'I don't want to talk to you guys any more.'" Smukowski and McVeigh then left and Officer Zens talked with Koput. After a brief conversation with Officer Zens, in which Koput stated he thought Zens was alright but he did not like the way the other two deputies looked at him, Koput was left unguarded in the doorless room for over two hours. In the late afternoon, Sergeant Tobiasz entered the room and asked Koput whether he wished to talk about the murder. Tobiasz read the *Miranda* admonitions to Koput. Koput stated he was willing to talk and then did so, giving a narrative statement to Tobiasz that he had committed the murder.

This conversation took place at about 4:15 P.M. on October 5, 1983. Counsel for Koput does not claim he was in custody from 9:30 A.M., when he arrived. Counsel, however, claims that Koput was in custody "by the time he gave the inculpatory statement to Tobiasz at 4:15 p.m." If the facts impel the objective conclusion that there was no custody prior to 4:15, there is no factual basis to conclude that a different objective answer should be reached in respect to the statement at that time.

Both the state and counsel for Koput agree that it is the objective standard that is to be utilized to ascertain "custody."[6]

---

right to have a lawyer whenever in the future he wished to see one. The error, if any, in Smukowski's statement was irrelevant and not prejudicial. The waiver form which he signed after the conversation recounted above specifically stated he was willing to make a statement and be questioned without an attorney. In any event, this incident is immaterial, for Koput was not in custody.

[6]At one point, counsel for the defendant placed emphasis upon the fact that Smukowski at 2 P.M. "suspected" that Koput was

The objective test is stated with clarity in *Berkemer v. McCarty,* 468 U.S. 420 (1984), a unanimous opinion in that respect. Therein, the court stated:

"A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442.

Footnote 35 to the paragraph above states in part:

"[A]n objective, reasonable-man test is appropriate because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.' "

We have previously held that, where the facts are undisputed, "custody" is a matter of law. *State v. Clappes,* 117 Wis. 2d 277, 280, 344 N.W.2d 141 (1984). The circuit court, on the same undisputed facts that we find in the record, concluded that Koput was not in "custody." Judge Gorenstein relied upon the fact that Koput was a volunteer and voluntarily accompanied the officers to the sheriff's department. Judge Gorenstein stated that the record was devoid of any evidence that Koput was at any time restrained of his liberty or that his status as a person voluntarily on the premises

implicated in the murder. This is, however, a subjective test and is inappropriate and does not comport with the test which both counsel consider to be correct.

of the sheriff's office changed until after he confessed to Sergeant Tobiasz.[7]

Applying the objective standard, we conclude that, while the record is replete with statements by the sheriff's employees that Koput was free to leave and hence not in custody, their not "in custody" conclusion is irrelevant. The question is whether a reasonable person in Koput's situation would have considered himself to be in custody.[8]

Therefore, the facts show that the defendant was not in custody until after his confession, sometime after 4:15 P.M. It was only then that a reasonable person viewing the situation objectively would conclude that he was not free to leave but was in custody. Even a guilty person, as Koput surely is, who would well have known subjectively that there was reason to place him in custody prior to his confession, could not reach the objective conclusion of "in custody" on the basis of the circumstances of his interview.

---

[7]As we stated above, the court of appeals did not address the "in custody" issue but elected to proceed on the assumption that, even were Koput in custody, his rights had not been violated. We do not quarrel with the court of appeals' analysis. We find it unnecessary to address the basis for that court's holding, in view of our noncustody conclusion.

[8]Older cases which rely upon *Orozco v. Texas,* 394 U.S. 324 (1969), do not reflect present law. In *Orozco,* the Supreme Court held that a suspect was in custody because one of the officers had the subjective intention of not letting the suspect go. *State v. Fillyaw,* 104 Wis. 700, 312 N.W.2d 795 (1981), rests upon that now discarded rationale. It should be emphasized, however, that *Fillyaw* correctly stated the law when it held that, where a person is not in custody, although he is interviewed or questioned in a police station, "*Miranda* rights were not violated ... as they were not necessary in that he was not in custody." *Fillyaw* at 722.

To review the undisputed facts: Koput's cooperation was entirely voluntary and at his own initiative. He volunteered some knowledge to the priest and consented to have the police called. He consented to talk to the sheriff's officers and took them to a bar where he stated he had seen Lucille Ann Nelson earlier in the evening she was killed. He voluntarily advised the officers where he could be reached the next day at his place of employment. He met them there. He readily agreed to accompany them to the sheriff's office for an interview. While enroute, he stated he needed cigarettes and, without any equivocation or hesitancy by the officers, was allowed to go into a store unaccompanied.

When he arrived at the sheriff's office, he voluntarily accompanied the escorting officers to a doorless room that was used for records. It was not a room that typically would have been used for custodial interrogation. He was never restrained and, for long periods of time, was not under observation and was completely unsupervised by any officer. None of the officers ever threatened him or accused him of criminal conduct. No guns or weapons, sometimes considered indicia of coercion or custody, were to be seen. The officers were not in police uniforms but in ordinary civilian street clothes. They were considerate of his needs; and while they accompanied him to the washroom, there is no evidence that this was a "custodial" escort. Rather, it was for the purpose of guiding him to his destination.

Viewing the circumstances in retrospect, it is apparent that the police had no reason or probable cause to place Koput in custody or reason to believe he was anything but a conscientious citizen who sought

to help law enforcement officers. The record reveals that, even after the confession, the officers had some feeling that they were dealing not with a criminal, but with a crackpot. What the subjective feelings of the officers may have been, however, is irrelevant. The question is to be resolved by the facts as they would appear to a reasonable person in the circumstances. Here there are no facts, viewed objectively, that would lead a reasonable person to conclude he was in custody. Because we conclude, as a matter of law from these undisputed facts, that Koput was not in custody, none of the statements given need be, or can be, suppressed as being violative of *Miranda v. Arizona,* 384 U.S. 436 (1966), or *Edwards v. Arizona,* 451 U.S. 477 (1981). They were admissible at trial.

In the first phase of the bifurcated trial, a unanimous jury found Koput guilty of the first degree murder of Lucille Ann Nelson. Following that determination of guilt, Koput was afforded a sequential trial before the same jury on the issue "of the defendant's mental responsibility." This second phase of the trial consumed several days of court time and resulted in the production of extensive psychological and psychiatric testimony, as well as evidence in respect to Koput's personal history and the circumstances of the murder.[9]

---

[9] **971.175 Sequential order of proof.** When a defendant couples a plea of not guilty with a plea of not guilty by reason of mental disease or defect, there shall be a separation of the issues with a sequential order of proof before the same jury in a continuous trial. The guilt issue shall be heard first and then the issue of the defendant's mental responsibility. The jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. This section does not apply to cases tried before the court without a jury.

The jury, after instructions which were not objected to, was asked two questions: (1) At the time of the crime did the defendant have a mental disease, and (2) as the result of the mental disease, did the defendant lack the substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.[10]

The jury was told that, in respect to these two questions, the defendant had the burden of proof and that burden was to a "reasonable certainty by the greater weight of the credible evidence."

The jury returned its verdict in response to the first question, answering, "No." One juror dissented. In accordance with the judge's instructions, question 2 was not answered.

Immediately thereafter, the defendant was sentenced to life imprisonment on the verdict of guilty to the charge of first degree murder returned by the jury in the first phase of the bifurcated trial.

Prior to submitting phase two to the jury, counsel for the state and for the defendant stipulated that, because the burden was on the defendant to prove lack of mental responsibility to a reasonable certainty by the greater weight of credible evidence, a five-sixths verdict was appropriate, i.e., that if ten of the twelve jurors concluded that Koput suffered from a mental

---

N.B. This statutory provision was repealed by Legislative Act 86, effective November 27, 1987. See Appendix A.

[10]The court, with participation of counsel, relied on Wis JI—Criminal 605 (1982), "Instruction on the Issue of the Defendant's Criminal Responsibility." It should be noted that that title reflects the conclusion of the Criminal Instructions Committee that the phrasing of the issue in terms of "responsible or not responsible" is preferable to "guilty but not guilty by reason of mental disease or defect." See Wis JI—Criminal 605, n. 2, p. 5.

disease and as the result of that disease was not "responsible," as defined in sec. 971.15, Stats., he was to be exonerated from criminal responsibility for his conduct.

Despite this stipulation, it is now asserted by the public defender that a five-sixths verdict was inappropriate, because any jury verdict in a criminal trial is required to be unanimous, that the right is so fundamental that it cannot be waived, and, if waivable, in this instance the waiver was undertaken by counsel only, and there is no evidence that Koput personally participated in that decision. Hence, the defense asserts, the waiver was not binding upon Koput.

We do not address the question of waiver or the adequacy of the stipulation, because we conclude, reviewing the decision of the court of appeals, that, as a matter of law, the jury verdict need not be unanimous—that a verdict of five-sixths of the jurors answering "yes" to the questions would exonerate from criminal responsibility a defendant previously found guilty. Hence, the stipulation or waiver was in fact no more than an agreement to conform the verdict requirements to the legal standard expressed in sec. 971.15(3), Stats. We further conclude that the verdict returned in this case—a finding by one juror that Koput was not to be held criminally responsible and a finding by eleven jurors that he was to be so held—was appropriate. There was no necessity in logic or in law that the jury in the second phase of an insanity trial be unanimous one way or the other. In the event five-sixths of the jurors conclude that a defendant has sustained his burden of proof, he is to be exonerated from criminal responsibility. If less than five-sixths of the jurors are so persuaded, the defendant has failed to prevail on his burden of proof,

is to be subjected to criminal sanctions, and is to be sentenced according to law. A unanimous verdict is not required in either event.

The court of appeals gave this issue of the case short shrift. It asserted that there is a right to a unanimous verdict in a criminal trial.[11] It then assumed that, because, under sec. 971.175, Stats., responsibility determination is sequential to a criminal trial, the sequence must *ipse dixit* be a criminal trial in the same sense and requiring the same type of jury treatment. While, in support of that position, resort is had to the comments to Wis JI—Criminal 605 by the Criminal Jury Instructions Committee, those comments do not purport to definitively conclude that the second phase of the bifurcated trial is a criminal trial in the same sense as the guilt phase. Rather, the comments stated that, in absence of appellate rulings or legislation, it was "best to assume" that a unanimous verdict was required. We do not find the committee's comment an authoritative source for the court of appeals' conclusion. Nor can we conclude that the committee comments were intended to be authoritative. The comments, rather, pointed out the unsettled status of the question and acknowledged that the "law [was] not explicit" as to whether a unanimous verdict is required at the second phase.

The court of appeals also asserted that this court, in *State v. Lehman,* 108 Wis. 2d 291, 321 N.W.2d 212 (1982), concluded that unanimity was required in phase two of a criminal trial. While, in *Lehman,* this

---

[11]The state on this review questions whether even this limited assertion is correct. We do not in this case have reason to accept the state's position that less than unanimity may be required. We proceed on the assumption that it is well established that a *criminal* verdict must be unanimous.

court stated that the "[t]wo essential features of the right to trial by jury in a *felony prosecution* in this state are that the jury be composed of twelve persons and that the jury reach a unanimous verdict" (emphasis supplied) (*Lehman* at 307), that sentence was irrelevant to the *ratio decidendi* of the case. While that statement reflects a standard truism, it does not address the question in this case: Whether the sequential trial on the question of responsibility is a "felony prosecution" in the same sense as the guilt phase. The portion of the opinion dealing with unanimity on which the court of appeals relied was not essential to the *Lehman* rationale.[12] It could have been omitted without doing violence to the logic of the opinion. The opinion in *Lehman* rested primarily upon the public policy perception that a fair trial required that all jurors should participate in all of the jury delibera-

[12]The court of appeals declined the invitation of defense counsel to disregard the sentence as dicta, apparently believing that it was required to give equal weight to every statement in our opinions. While such deference is gratifying, we would not consider it inappropriate for the court of appeals or a circuit court to evaluate statements in our opinions on the basis of whether they constitute dictum. We point out, however, that, in our superintending and administrative capacity, some pronouncements that are technically obiter dictum are nevertheless administrative or supervisory directions that are intended for the guidance of the court system and are to be followed. The statement in question is not such an administrative direction.

It should also be noted that the court of appeals quoted the committee comments to Wis JI—Criminal 605 discussing *Lehman* which stated, "Though the issue was not essential to the disposition of the case, the Wisconsin Supreme Court has assumed that a unanimous verdict was required at the second phase." The court of appeals nevertheless treated the statement in *Lehman* as the controlling *ratio decidendi, Koput*, 134 Wis. 2d at 205.

tions.[13] This court held that the substitution of a juror midway in the course of the jury deliberations in the second phase meant that the new juror had no opportunity to hear the other eleven on their views and conclusions during the first half of their deliberations and the other jurors had no chance to hear the views of the new juror on those issues already discussed. The rationale of *Lehman* is basically that, as a matter of good policy—fairness and due process— a jury be a deliberating body, all of whose members, the same members, work together throughout the factfinding process. This reasoning is not premised on whether there be a twelve-person jury, nor on whether the jury be unanimous. The court's reasoning—the need for collegial deliberations by the same persons— is equally applicable in cases where a five-sixths verdict is clearly permissible. The harm sought to be avoided in *Lehman* is harm to the deliberative process rather than harm to the principle of unanimity. We do not retreat from the rationale of *Lehman,* but its holding is not dispositive of the issue in the instant case.

■
The court of appeals also placed great emphasis on the verbiage of sec. 971.15(3), Stats., particularly the portion which recites, "Mental disease or defect

---

[13]That this was the controlling issue in *Lehman* is obvious from the court's statement of defendant's arguments on review. *Id.* at 296. The arguments were that there was prejudicial error for failure to make a finding that the original juror was properly discharged and that there was error in seating a substitute juror after the deliberations had been under way for a substantial time. Nowhere was an argument posited that the verdict was defective for lack of unanimity. In fact it is clear that the verdict was unanimous. Unanimity was a non-issue in *Lehman.*

excluding responsibility is an affirmative defense . . . ." The court of appeals then apparently concluded that such affirmative defense was to be equated with affirmative defenses in the guilt phase of the trial, and it used this premise to bolster its conclusion that the second phase was a part of "one continuous criminal trial." *Id.* at 205. It is obvious, however, that the affirmative defense mentioned in sec. 971.15(3) is of an entirely different nature from affirmative defenses utilized by defendants in the guilt phase, i.e., alibi, privilege, et cetera, which if proved result in an outright dismissal of the charge. Success on the affirmative defense of mental disease or defect does not have that result; rather, it is an affirmative defense to "responsibility"—it relieves the person of the *sanctions* for criminal conduct. It does not relieve the person already found guilty in the first phase of the factual finding of criminal conduct. Rather, the successful assertion of the affirmative defense in phase two results in a noncriminal-sanction disposition. Thus, it is clear that phase two is not determinative of guilt in the sense of criminal conduct but only determinative of the disposition of the defendant in terms of the treatment to be afforded one who was insane at the time the guilty conduct was performed.

While we write upon a substantially clean slate, nevertheless we conclude that the jurisprudential history of this court's confrontation with the problem of mental responsibility as an exoneration from criminal sanctions and this court's efforts to address this problem are relevant and controlling. This history leads to the conclusion that the question of guilt (i.e., was the *conduct* of the defendant criminal?) is settled in the felony prosecution that takes place in phase

one. Phase two is dispositional in nature—is this person who has been found guilty beyond a reasonable doubt of criminal conduct to be punished or is there to be a different disposition because, in good conscience and public morality, the defendant is a person, because of mental disease or defect, who ought not to be held criminally liable for his or her conduct. Thus, we conclude the jury rules that apply to proof of the elements of the crime do not apply in phase two.

The distinction was stated in *Steele v. State,* 97 Wis. 2d 72, 294 N.W.2d 2 (1980).

In *Steele,* relying on *Curl v. State,* 40 Wis. 2d 474, 484, 162 N.W.2d 77 (1968),[14] we accepted the view that, "'To bifurcate a trial is to separate completely the issue of lack of accountability due to insanity from the issue of whether the crime was committed.'" *Steele,* at 90. In *Steele,* we stated that the issue posed by sec. 971.15, Stats.—whether or not there should be criminal responsibility for criminal conduct—was essentially a moral issue. The question in the second phase of the bifurcated trial we stated to be:

> "Is it just, in light of the ethics and standards of our society, to hold a person who is insane accountable for what has been done." *Steele,* at 96.

The issue in *Steele* was whether it was appropriate or permissible, in light of a defendant's rights to due process and privilege against self-incrimination, to permit certain psychiatric evidence in the case at the guilt stage—phase one. We held that it was not. We stated that this evidence, clearly admissible on the question of responsibility in phase two, was not to be admitted earlier because such evidence would put in

[14]*See, also, State v. Hebard,* 50 Wis. 408, 420, 184 N.W.2d 156 (1971).

jeopardy safeguards designed for the protection of the defendant, as well as of society. *Steele* is merely our latest pronouncement that makes clear that the responsibility phase of the bifurcated trial has an entirely different purpose, and is indeed a different type of trial, from the guilt phase, where the burden is on the state to prove each and every element of the crime beyond a reasonable doubt. *Steele* merely reinforces previous statements of this court that mental responsibility or not, as determined in phase two, is dispositional in nature and has nothing to do with whether the defendant is guilty. The focus of the two phases of the sequential trial is different. The elements of a crime must be proved beyond a reasonable doubt and must be accepted by a unanimous verdict. Because mental responsibility is not an "element" of the crime, but a condition on which criminal sanctions can be predicated or an alternative disposition based if insanity is proved, it is not surprising that a different burden of proof has been imposed. We stated in *Holland v. State,* 91 Wis. 2d 134, 138, 280 N.W.2d 288 (1979), that, for the protection of persons charged with crime, in a "guilt" phase proof must be beyond a reasonable doubt and that the unanimity requirement effectuates compliance with that burden of proof.

In sec. 971.15(3), Stats., the burden to be assumed by one who seeks to prove lack of mental responsibility is stated to be "to a reasonable certainty by the greater weight of the credible evidence." Thus, the policy reasons—to effectuate the purpose of "beyond a reasonable doubt" that *Holland* stated requires a unanimous verdict—are absent or at least sharply minimized in phase two, as compared to the guilt phase of a criminal trial. Unanimity is not impelled by the usual reasons. Hence, it is not unreasonable to

hold unanimity is not required, because phase two does not put the state to its proof of the elements of the crime. As we said in *Steele,* in phase two we are concerned with a moral issue—the mental responsibility of one who has been found to have committed a felonious act.

In *State v. Hanson,* 100 Wis. 2d 549, 563, 302 N.W.2d 452 (1981), we stated that the burden, "beyond a reasonable doubt," is universally associated with criminal law. It follows that, quite aside from a functional analysis that the responsibility phase is not concerned with the elements of criminal conduct, the mandated burden of proof recited in sec. 971.15(3), Stats., is in itself evidence that phase two is not a "criminal" part of the trial. *Hanson* states that the reasonable-doubt standard imposes the ultimate burden on the state for the protection of the individual charged in the guilt phase.

The lesser burden which is placed upon the defendant in phase two also acts to the advantage of the person charged, for he is not required to prove beyond a reasonable doubt his lack of responsibility. The lesser burden is, comparatively speaking, advantageous to the defendant. Thus, protection of the defendant is a thread that runs through both phases of the trial. Unanimity protects the defendant in phase one. Less than a unanimous verdict, combined with a lesser burden of proof, would effectuate that policy and further the policy of a just society, as a matter of morality, not to impose criminal sanctions on a person who, because of mental disease or defect, lacked the substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

Thus, from the functional viewpoint of what is to be proved in each phase, proof of the elements of the crime in the first phase and proof of nonresponsibility in phase two are separate and distinct issues that need not be governed by the same rules in respect to either burden of proof or jury unanimity. As Justice Horace Wilkie's concurring opinion stated in *State v. Shoffner,* 31 Wis. 2d 412, 443, 143 N.W.2d 458 (1966), in considering the question of insanity, "we are largely concerning ourselves with the difference in the institutional treatment of the defendant." It is obvious that this concern is far removed from a determination of whether the defendant committed a felonious act.

Additionally, this court has held, in *State v. Leach,* 124 Wis. 2d 648, 662, 370 N.W.2d 240 (1985), that the judge may grant a directed verdict on the motion of the state if the defendant has failed to produce any credible evidence tending to prove a lack of responsibility. In a criminal case, to grant a summary judgment to the state, even where the state's evidence is overwhelming and the evidence of the defendant to the contrary is totally lacking, would be anathema to all of our precepts of constitutional law. Accordingly, it is manifest that this court has not treated phase two as an integral part of the state's criminal case.

■
We also conclude that this court is not bound by the apparent strictures of sec. 971.175, Stats., for this statute is no more than the codification of this court's holding in *State ex rel. La Follette v. Raskin,* 34 Wis. 2d 607, 150 N.W.2d 318 (1967).

We find it necessary to address this point because the public defender asserts that, because the responsibility phase is sequential to the guilt phase and both

are to be "before the same jury in a continuous trial," the sequence to the criminal phase is thus also indisputably criminal and, hence, a unanimous verdict is required by legislative mandate.

The genesis of sec. 971.175, Stats., *supra* footnote 9, was *Raskin, supra.* In *Raskin,* the defendant sought the supervisory intervention of this court to prevent the circuit court from requiring the defendant, if he wished to present evidence of lack of sanity, to present factually incriminating evidence before the same jury that was concurrently considering the question of his guilt or innocence, *i.e.,* had the defendant committed the acts charged. Defendant asked that no psychiatric evidence be required until a verdict of guilty had been reached on the issue of guilt or innocence.

The court concluded that, in such circumstance, it would be violative of due process to allow in evidence, in a unitary trial, the testimony of a court-appointed psychiatrist who had interviewed the defendant. It rectified this problem by directing, in the exercise of its common-law powers, a sequential order of proof. This it did by decreeing that the issue of guilt be decided first and then, if necessary, the question of lack of criminal responsibility.

This was done despite a statute, sec. 957.11, Stats. 1965, "which on its face requires the special plea of insanity to be interposed at the time of arraignment and 'shall be tried with the plea of not guilty.'" *Raskin,* at 616.

This court concluded that the statute clearly contemplated the simultaneous jury consideration of guilt and insanity—and not in a split trial. It concluded, however, that, to follow the legislative directive in the circumstances of *Raskin,* "would render the trial unfair and violate the accused's constitutional right to

due process." *Raskin,* at 623. The dilemma was solved by resort to what the *Raskin* Court denominates a court's "common-law right" in controlling submissions to the jury. It directed that the issues be submitted sequentially—with the question of guilt to be decided by a separate verdict, and only thereafter, if necessary, a trial and verdict on the question of insanity.

Thus, *Raskin* was decided against a background statute that required a single trial, with the guilt and insanity issues to be tried concurrently. Were it not for this statute, the *Raskin* Court stated that separating the pleas into two proceedings would create no problem and that ideally "in order to insure a constitutionally fair trial the two issues must be tried and determined *separately and independently* of each other." (Emphasis supplied.) *Raskin* at 616.

It was only the constraint of the then existing statute that led to the present sequential procedure. *Raskin* clearly states that the issues are independent and should be separately tried. There is no intimation that both issues are to be resolved by criminal trials. Indeed, *Raskin* makes it clear they are not, that each determination is separate and independent. Our present sequential trial is merely a method of insuring due process, while allowing this court in 1967 to adhere to the extent possible to the existing statutory requirement of a unitary trial. But this deference to the legislature, then, should not be construed to mean that both phases are but divisions of a single criminal trial. They are not. *Raskin* makes that clear. Thus, there is no reason whatsoever to impose all the strictures required of a jury in a criminal case on the jury in the functionally separate and independent phase concerning mental responsibility. The unitary

trial requirement of sec. 957.11, Stats., that the *Raskin* court was required to circumvent to assure a constitutionally fair trial no longer exists. Because the procedure was devised by this court to assure that the sequential phases were in fact independent, it is fatuous to now interpret a court-decreed procedure in a manner that will once again blur these separate delineations.[15] The thesis of the public defender that the responsibility phase is but one part of a single criminal proceeding, and therefore must, in all respects, be treated in the same way as the guilt phase, is unsupportable. The public defender's syllogism—a criminal defendant has a constitutional right to a unanimous verdict in a criminal case; the responsibility phase of a sequential trial is a part of a criminal trial, therefore the five-sixths verdict returned in Koput's case denied him a constitutional verdict—is flawed, because it is demonstrably evident that the responsibility phase is not a part of a "criminal" trial. The entire history of bifurcated trials from *Raskin* on makes evident that the purpose of each of the two phases is entirely different.

Additionally, and most self-evident, is the fact that the burden of proof is different. While sec. 971.175, Stats., codifies *Raskin* in respect to the sequential trial, it also codifies *State v. Shoffner*, 31 Wis. 2d 412, 143 N.W.2d 458 (1966), in respect to the burden of proof for one who asserts his lack of mental responsibility under the test initiated by the American Law Institute. *Shoffner* was one of a series of cases which wrestled with the *M'Naghten* right-or-wrong

[15]The comments to ch. 255, Laws of 1969, point out that sec. 971.175, Stats., is but a codification of the supreme court's holding in *Raskin*.

test, as compared to the ALI test,[16] now codified in sec. 971.15. *Shoffner* was a compromise case. A majority of the court concluded that *M'Naghten* was the appropriate sanity test, a test that required the state to prove mental responsibility *beyond a reasonable doubt.* In the same case, a partly different majority granted a defendant the option to elect the ALI test if he assumed the burden of proving lack of mental responsibility. The court directed that, where a defendant makes that election, he must waive the provisions of law that place the burden of proving sanity beyond a reasonable doubt upon the state, and then assume the burden of convincing the jury to a *reasonable certainty, by the greater weight of the credible evidence,* that under the ALI definition, he lacks the requisite responsibility. *Shoffner* at 427. The ALI test and the burden of proof as set forth in *Shoffner* by this court has been codified in sec. 971.175.

It is apparent the *Shoffner* compromise in respect to the use of the ALI test and in respect to the noncriminal burden of proof was intended to afford a comprehensive protection of the rights of defendants.

■

The usual policy and constitutional reasons for a unanimous verdict do not apply where the issue to be tried is noncriminal.[17] This, however, does not definitively determine what fractional verdict less than unanimity is appropriate. Because we have concluded that the responsibility phase is not criminal and the

---

[16]"The American Law Institute, Model Penal Code, Proposed Official Draft, May 4, 1962, p. 66, sec. 4.01." *State v. Shoffner,* 31 Wis. 2d at n. 2, p. 418.

[17]The mental state, other than criminal intent, at the time of a crime is no more a matter or criminal inquiry than an inquest into mental responsibility at the time of the execution of a will.

unanimous verdict required by a criminal proceeding is not mandated, it would appear appropriate to utilize the five-sixths verdict available in civil trials. This is not to say that the responsibility phase is purely civil. Clearly, at one time when the burden of proving sanity was on the state and a unanimous finding of sanity was required, the "proceeding" was criminal. Hence, to some degree, in its ancestry at least, it is not completely divorced jurisgenetically from its antecedents. We, therefore, will not denominate it a civil proceeding. Rather, it is a special proceeding in the dispositional phase of a criminal proceeding—a proceeding that is not criminal in its attributes or purposes. Hence, it is appropriate to use the five-sixths verdict that is used in civil actions. That this is an appropriate fractional verdict is indicated by the civil burden of proof placed upon the defendant by *Shoffner* and by the subsequent statutory codification of sec. 971.15(3). We conclude that, to sustain his burden of proof of lack of responsibility, the defendant must convince at least ten jurors. If the defendant convinces a lesser number, the defendant has failed in assuming the burden of proof and has not proved lack of criminal responsibility and, accordingly, becomes subject to the usual criminal sanctions.[18]

We conclude that the issue of Koput's mental responsibility was properly determined on an appropriate legal standard—a unanimous verdict was not required. We therefore reverse the court of appeals,

---

[18]The parties in the instant case agreed to a five-sixths verdict. Hence, it could be argued that, if unanimity is not required, the waiver should govern. We conclude, however, as stated above, the waiver was legally meaningless, for a unanimous verdict is not required.

which held that the criminal standards of unanimity were constitutionally applicable to the responsibility phase.

Because we hold there was no error in phase two, the question of whether a retrial of the entire case is required, as mandated by the court of appeals, is technically moot.

However, as the question may recur in cases tried under sec. 971.175, Stats., we find it appropriate to decide it. As pointed out above, in the discussion of *Raskin* the sequential trial was devised against the background of a statute that then required a unitary trial. Hence, the sequential procedure was fitted into the existing statutory structure. Nevertheless, in *Raskin* and in other cases, this court has repeatedly said the phases are independent. In view of the genesis of sec. 971.175, there is now no jurisprudential reason for a trial before a single jury. That this is true is also made evident that part of the sequence can be before a jury and part before a judge.

While, as stated in *Raskin,* there shall be no appeal from phase one until phase two has been completed, this is clearly a rule of judicial administration designed to assure the orderly processing of appeals. *Raskin* at 626–27. We conclude, therefore, that, where there is an error in the second phase of the sequential trial, there is no reason to retry the guilt phase. The fact that the opposite view has some support if a literal view of sec. 971.175, Stats., is taken is dispelled once the background of the statute is understood. That is not to say that a sequential trial before a single jury is not usually appropriate. In the interests of judicial administration, time and resources will be conserved by initially using a single

jury sequentially. However, after a remand for the correction of error on phase two, it would be counter to a policy of conservation of time and resources to allow an entirely new trial. Accordingly, pursuant to this court's supervisory authority, we direct that, where a remand on phase two is required, a new trial be held only for the proper trial of the mental-responsibility phase of the sequential proceedings.[19]

In summary, then, we conclude that the defendant Koput was not in custody at the time he gave his inculpatory statements. Accordingly, the alleged violations of his rights defined by *Miranda* never occurred. His statements were therefore admissible, and the trial court did not err in denying the motion to suppress.

We conclude that the court of appeals erred when it concluded Koput's rights were violated when he was found to have failed to carry his burden to prove lack of mental responsibility by less than a unanimous verdict. Because we conclude a five-sixths verdict would have been sufficient and because the jury was properly instructed to that effect and a five-sixths verdict was utilized, Koput was afforded a proper determination of mental responsibility.

We reverse the court of appeals.

*By the Court.*—Decision reversed.

---

[19]For cases controlled by the new statute, sec. 971.165, Stats., that section will apply. However, for cases such as this which came to trial before the effective date of sec. 971.165, November 27, 1987, the above language controls. Under neither the new statute nor this opinion is defendant entitled to a new trial on both parts if remand is necessary on part two.

## APPENDIX A

### STATE OF WISCONSIN

Date of enactment: November 19, 1987

Date of publication:* November 27, 1987

1987 Assembly Bill 73

# 1987 WISCONSIN ACT 86

AN ACT *to repeal* 971.175; and *to create* 971.165 of the statutes, *relating to* criminal trials in which a person pleads not guilty by reason of mental disease or defect.

*The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:*

Prefatory note: In September 1979, the judicial council established the insanity defense committee to study the problems associated with the criminal trials of mentally ill persons and to recommend such changes in the statutes governing the subject as would improve the administration of justice.

The committee was chaired by Judge Gary B. Schlosstein and included the following members: Justice Shirley S. Abrahamson, Judge Thomas H. Barland, William M. Coffey, Francis R. Croak, Judge Edwin C. Dahlberg, Chief Judge John A. Decker, Prof.

---

* Section 991.11, Wisconsin Statutes 1983–84: **Effective date of acts.** "Every act and every portion of an act enacted by the legislature over the governor's partial veto which does not expressly prescribe the time when it takes effect shall take effect on the day after its date of publication as designated" by the secretary of state [the date of publication may not be more than 10 working days after the date of enactment].

Walter J. Dickey, Robert D. Donohoo, Senator James T. Flynn, Frederick A. Fosdal, M.D., Jon Peter Genrich, Stephen M. Glynn, J. Douglas Haag, Prof. John J. Kircher, Albert A. Lorenz, M.D., Judge Daniel P. McDonald, Randall E. Morey, Rep. Mary Lou Munts, David C. Niblack and Leigh M. Roberts, M.D. The reporters for the committee were Frederick A. Fosdal, M.D., James L. Fullin, Jr. and Richard Malmgren.

The committee held 21 meetings between October 1979 and May 1981. Minutes of the final 13 meetings are available from the judicial council. The committee's recommendations, contained in 1981 Assembly Bill 765, were approved by the judicial council at its June 26, 1981, meeting.

The legislature enacted the provisions of 1981 Assembly Bill 765 governing mental competency to undergo criminal proceedings. The enactment became chapter 367, laws of 1981.

The present bill is based upon a portion of those provisions of 1981 Assembly Bill 765 which were not enacted. Detailed explanations are provided in the Notes to the bill's sections.

SECTION 1. 971.165 of the statutes is created to read:

**971.165 Trial of actions upon plea of not guilty by reason of mental disease or defect.** (1) If a defendant couples a plea of not guilty with a plea of not guilty by reason of mental disease or defect:

(a) There shall be a separation of the issues with a sequential order of proof in a continuous trial. The plea of not guilty shall be determined first and the plea of not guilty by reason of mental disease or defect shall be determined second.

(b) If the plea of not guilty is tried to a jury, the jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. No verdict on the first plea may be valid or received unless agreed to by all jurors.

(c) If both pleas are tried to a jury, that jury shall be the same, except that:

1. If one or more jurors who participated in determining the first plea become unable to serve, the remaining jurors shall determine the 2nd plea.

2. If the jury is discharged prior to reaching a verdict on the 2nd plea, the defendant shall not solely on that account be entitled to a redetermination of the first plea and a different jury may be drawn to determine the 2nd plea only.

3. If an appellate court reverses a judgment as to the 2nd plea but not as to the first plea and remands for further proceedings, the 2nd plea may be determined by a different jury drawn for this purpose.

(d) If the defendant is found not guilty, the court shall enter a judgment of acquittal and discharge the defendant. If the defendant is found guilty, the court shall withhold entry of judgment pending determination of the 2nd plea.

(2) If the plea of not guilty by reason of mental disease or defect is tried to a jury, the court shall inform the jury that the effect of a verdict of not guilty by reason of mental disease or defect is that, in lieu of criminal sentence or probation, the defendant will be committed to the custody of the department and will be placed in an appropriate institution unless the court determines that the defendant would not pose a danger to himself or herself or to others if released under conditions ordered by the court. No verdict on the plea of not

402

guilty by reason of mental disease or defect may be valid or received unless agreed to by at least five-sixths of the jurors.

(3)(a) If a defendant is not found not guilty by reason of mental disease or defect, the court shall enter a judgment of conviction and shall either impose or withhold sentence under s. 972.13(2).

(b) If a defendant is found not guilty by reason of mental disease or defect, the court shall enter a judgment of not guilty by reason of mental disease or defect. The court shall thereupon proceed under s. 971.17. A judgment entered under this paragraph is interlocutory to the commitment order entered under s. 971.17 and reviewable upon appeal therefrom.

Note: Wisconsin presently requires each element of the crime (including any mental element) to be proven before evidence is taken on the plea of not guilty by reason of mental disease or defect. This statute provides for the procedural bifurcation of the pleas of not guilty and not guilty by reason of mental disease or defect, in order that evidence presented on the latter issue not prejudice determination of the former. *State ex rel. La Follette v. Raskin,* 34 Wis. 2d 607 (1976).

The legal effect of a finding of not guilty by reason of mental disease or defect is that the court must commit the defendant to the custody of the department of health and social services under s. 971.17.

Subsection (1)(c) provides several necessary exceptions to the prior statute's requirement that the same jury try both pleas in order to avoid unnecessary redeterminations of guilt. *Kemp v. State,* 61 Wis. 2d 125 (1973).

Subsection (2) allows a five-sixths verdict on the plea of not guilty by reason of mental disease or defect.

## SECTION 2. 971.175 of the statutes is repealed.

Note: This section has been replaced by new s. 971.165.