**William LEACH a/k/a William Martin,**
**Petitioner–Appellant,**

v.

**Darrell KOLB, Acting Superintendent,**
**and Attorney General of the State of**
**Wisconsin, Respondents–Appellees.**

No. 88–2490.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1990.

Decided Aug. 24, 1990.

William Leach, Waupun Correctional Institution, Waupun, Wis., Allen E. Shoenberger, Loyola Law School, Chicago, Ill., for petitioner-appellant.

Donald J. Hanaway, Atty. Gen., Thomas Balistreri, Asst. Atty. Gen., Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondents-appellees.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Petitioner William Leach, currently serving a 48–year sentence in the Waupun Correctional Institution in Waupun, Wisconsin, appeals the district court's denial of his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Leach was convicted in Wisconsin state court on four counts of armed robbery and one count each of attempted armed robbery, attempted murder and false imprisonment. We affirm.

## I.

Leach's convictions on the above charges stem from four distinct incidents of criminal activity occurring on four separate days within a one-month time period in the City and County of Milwaukee, Wisconsin. The Wisconsin Supreme Court, in reviewing Leach's convictions, summarized these incidents as follows:

"On January 7, 1982, the defendant picked up Stanley Blalock and drove to 3424 North 12th Street in Milwaukee. They stayed there for a short time. Sometime later that day, Blalock and the defendant burglarized a home taking among other things a color television set. They returned to the North 12th Street apartment where the defendant argued with Blalock and accused him of appropriating the proceeds of the crime. The defendant left and returned 15 to 20 minutes later.

Sometime in the early morning hours of January 8, 1982, Blalock asked the defendant if he could retrieve his boots from

the defendant's car. Blalock testified the defendant had a 'strange' look on his face, 'as if he was up to something.' The defendant and Blalock went to defendant's car and as Blalock reached into the car, the defendant shot him in the back. Blalock pulled back and asked what he was doing, whereby the defendant responded 'You know what I am doing.' Blalock lunged at the defendant. Because his left hand was paralyzed from the wound, Blalock hit the defendant with his right hand. The defendant then shot Blalock in the shoulder. Blalock pushed the defendant back and ran. The defendant shot him again, hitting him in the right thigh. Blalock ran into a house across the street and told [the residents] what had happened. The next thing Blalock remembered was the inside of the ambulance.

Blalock was hospitalized for about two weeks. The doctors decided not to try to remove the bullet from his back because it was lodged too close to a blood vessel leading to his heart.

On January 29, 1982, Gregory Greenwood, a friend and two young women were out on a double date. At approximately 11:30 p.m., Greenwood parked his father's automobile on the northwest side of Milwaukee in an area commonly used by high school students for socializing. A short time later the two females left the car. As the females were returning to the car, they were approached by the defendant and asked what they were doing there. One of the girls stated that they were not doing anything and started to walk away from the defendant, but he followed them. Because the two females did not want to get their dates in trouble, they decided not to return to the car. Greenwood testified he saw the two females followed by the defendant walking a short ways away not returning to the car but proceeding down the road. Greenwood became concerned and called to the females to come back. He approached the two young women and the defendant and asked what was going on. The defendant said nothing was going on, pulled out a gun and ordered them into the car.

The defendant instructed Greenwood to drive. At various times the defendant told Greenwood to stop the car. At one point the defendant told Greenwood to stop the car and pointing the revolver at Greenwood's head, demanded money from those in the car. They claimed they had no money and the defendant searched the females' purses. The defendant then told them they had three seconds to come up with some money. Fearing for their lives, Greenwood and his companions gave the defendant most of their cash.

The defendant then ordered Greenwood to keep driving, periodically telling Greenwood to stop the car. About two hours after they first met, the defendant ordered the driver to stop the car and all its passengers out. The defendant took the car, and Greenwood went to the nearest house to call the police.

On February 6, 1982, Mrs. Shang Yu Huei Lee was working as desk clerk at the North Shore Inn in Glendale awaiting the arrival of the usual desk clerk. The defendant, having stayed at the hotel for three days, entered the hotel lobby. Conversation took place; the defendant left and returned sometime later. He approached the desk and pointed a gun at Mrs. Lee's head and demanded the motel's money. She opened a cash register and handed him its contents. At that point, one of the maids entered the lobby. The defendant demanded more money. Mrs. Lee opened another money drawer and handed the defendant its cash. The defendant ordered Mrs. Lee and the maid into the office closet.

Shortly thereafter, Dale Tech reported for duty as desk clerk. Upon entering the lobby, the defendant pointed his gun at Tech and asked whether he had a car and where it was parked. Tech responded he had a car and it was in the parking lot. The defendant reached into Tech's pocket, took his wallet and instructed Tech to pick up the defendant's bags and go to the car. On the way out, the defendant ripped the phone lines out of

the motel room and off the switchboard and handset.

When they got to the car, the defendant put his luggage into the trunk and told Tech to drive. Still pointing his gun at Tech, the two drove for some time. The defendant then told Tech to stop the car and get into the trunk. Tech refused three times, claiming it was too cold and that he had cooperated with the defendant and the defendant should cooperate with him. The defendant told Tech he had shot people before and again ordered Tech to the trunk. Tech again refused and the defendant allowed him to lay on the floor in the back seat. The defendant proceeded to drive the car and finally parked it in a garage at 3323 North 22nd Street. The defendant exited the car, removed his luggage and instructed Tech to remain in the car for ten minutes. The defendant then threw the keys up onto the opened garage door. Tech waited ten minutes, retrieved his car keys and notified the police of what had just happened.

Two days later, at approximately 11:55 p.m. on February 8, 1982, the defendant entered the Park Avenue Nightclub. He entered the upstairs office, pulled a gun on the secretary in the outer office, and ordered her into the manager's office. The general manager, David Watt, testified the defendant waved his gun in his face and told him and the secretary to lie on the floor.

The defendant asked Watt where the money was and he answered it was in the next office. The defendant told Watt to get up and take him there. The defendant, Watt and his secretary entered the small room whereupon the defendant ordered Watt to open the safe. Watt complied and the secretary proceeded to put the paper currency from the safe into the defendant's folder. She finished putting the money into the folder and Watt offered it to the defendant. As the defen-

dant reached for it, Watt let it drop to the floor. The defendant reached down to pick it up and Watt grabbed the defendant's hand which was holding the gun. A struggle ensued and Watts' [sic] secretary screamed for help and ran out of the room. The defendant dropped the gun and ran out of the office. The day maintenance man heard the commotion and as the defendant ran past him he grabbed him and forced him to the ground. Watt and the maintenance man subdued the defendant until the police arrived."

*State v. Leach*, 124 Wis.2d 648, 652–56, 370 N.W.2d 240, 244–45 (1985).

After Leach's arrest at the Park Avenue Nightclub, the state filed four criminal informations charging Leach with seven criminal offenses. The first information alleged that Leach attempted the first-degree murder of Stanley Blalock on January 8, 1982. The second information charged Leach with the attempted armed robbery of David Watt on February 8, 1982, and the armed robbery of Gregory Greenwood and Christine Guenther, one of Greenwood's three companions in the automobile,[1] on January 29, 1982. In the third information, the state charged Leach with the armed robbery and false imprisonment of Dale Tech on February 6, 1982. The final information alleged that Leach committed the armed robbery of Shang Yu Huei Lee on February 6, 1982. Upon the state's motion for joinder of all counts at Leach's arraignment, the trial court consolidated the four informations for trial.

Leach entered pleas of not guilty and not guilty by reason of mental disease or defect to all charges, *see* Wis.Stat. § 971.15, thus triggering Wisconsin's statutory scheme for a bifurcated criminal trial on the issues of guilt and insanity. *See* Wis. Stat. § 971.165.[2] The trial court appointed Dr. William Crowley, a psychiatrist, to examine Leach regarding his special plea. In his report, Dr. Crowley expressed some

---

1. The other individuals in the vehicle were Joanne Guenther and Michael Olson.

2. At the time of Leach's conviction, the statute governing the entry of insanity pleas was codified at Wis.Stat. § 970.175. In 1987, the statute

was repealed and recodified, as amended, at Wis.Stat. § 970.165; however, the amended version contains no substantial changes relevant to the issues raised in this appeal.

doubt as to Leach's competency to stand trial, and further recommended an inpatient psychiatric examination. Subsequently, the court ordered an inpatient psychiatric examination by the Wisconsin Department of Health and Social Services. The Department's examining physician concluded that there was no evidence of mental disease or defect which would render Leach unable to understand the nature of the proceedings or to assist in his own defense at trial. *See* Wis.Stat. § 971.13. Based on this report, the trial court found Leach competent to stand trial.

A consolidated trial on the guilt or innocence phase of the trial was commenced on November 29, 1982. The prosecution presented each case separately as to each of the incidents of criminal activity. That is, all of the victims and witnesses to one of the charged crimes testified and were cross-examined before evidence pertaining to the next crime was presented. After the prosecution concluded its presentation of witnesses, the defense tendered only one witness, an assistant district attorney, who stated that he knew Leach personally and that he never perceived the defendant to be an aggressive, assaultive or violent individual. At the conclusion of the guilt/innocence phase of the bifurcated trial, the jury found Leach guilty of each and every crime charged.

At the insanity phase of the trial, Leach offered the testimony of two witnesses, Dr. Crowley and Dr. Kenneth Smail.

"Dr. Crowley testified that based upon the information he obtained from the defendant 'there was no way [he] would be able to reach any conclusion about [the defendant's] mental state at the time of these offenses' and that he was unable to determine whether the defendant was suffering from schizophrenia at any time. Though he could not form an opinion to a reasonable degree of medical certainty, Dr. Crowley stated in his own mind that he doubted whether the defendant was competent to stand trial. He did not know whether the defendant was willfully withholding information and malingering or whether he genuinely could not recall and suffered from some type of mental impairment. At the time of his examination, Dr. Crowley only recommended in-patient evaluation.

Dr. Crowley stated the defendant mentioned he had slipped and hit his head and suffered headaches, but that the defendant's electroencephalogram was normal, that is, there were no organic lesions on the brain and the electric activity was also normal. The defendant claimed he was hospitalized for that fall, but it was never verified. The defendant also claimed to Dr. Crowley that he attempted suicide twice. That claim could have been verified, but the defendant did not do so. Lastly, Dr. Crowley testified there was nothing in the nature of the defendant's crimes, nothing innately strange about the offenses, that would lead him to conclude the defendant was suffering from mental disease or defect.

Dr. Kenneth Smail, a psychologist, similarly had difficulty getting the defendant to respond to questions during his examination. Dr. Smail testified he conducted psychological tests of the defendant to determine whether or not a real mental disease or defect was present or whether the defendant was malingering. Dr. Smail stated ... he ... was unable to form an opinion to a medical degree of certainty that the defendant was suffering from mental disease or defect at the time the offenses were committed. Moreover, Dr. Smail testified that there was nothing in the reports which would be suggestive of a mental disease or defect or any particular psychological abnormality."

*State v. Leach,* 124 Wis.2d at 656–58, 370 N.W.2d at 245–46 (footnote omitted). The prosecution offered no witnesses at the insanity phase of the trial and, based upon the inconclusiveness of the testimony of Drs. Crowley and Smail, moved for a directed verdict on the issue of mental disease or defect, and the trial court granted the same. Thereafter, the court entered judgment of conviction on all seven charges and sentenced Leach to 48 years'

imprisonment.[3]

Leach appealed his conviction to the Wisconsin Court of Appeals, arguing that: (1) the trial court violated his constitutional rights in requiring him to proceed to trial while he was suffering from amnesia, which rendered him unable to assist in the preparation of his defense; (2) his attorney's performance at trial was constitutionally ineffective in that he failed to request an instruction on endangering safety by conduct regardless of life, *see* Wis.Stat. § 940.23, a lesser included offense of attempted first-degree murder in Wisconsin; (3) the trial court erred in directing a verdict on the issue of mental disease or defect; and (4) the trial court erred in permitting the joinder of the offenses charged in the four informations. Although rejecting his claims regarding competency to stand trial and ineffective assistance of counsel, the court of appeals reversed and remanded on the directed verdict and joinder issues. Specifically, the court held that a directed verdict on the issue of mental disease or defect is never proper because, in Wisconsin, the determination of "whether the defendant met his burden of proving insanity must be decided by the jury." *State v. Leach,* 122 Wis.2d 339, 352, 363 N.W.2d 234, 240 (Ct.App.1984), *rev'd,* 124 Wis.2d 648, 370 N.W.2d 240 (1985). The court also held that the four informations had been improperly joined and that misjoinder is not subject to harmless error analysis. *Id.* at 355–56, 363 N.W.2d at 242.

The state appealed to the Wisconsin Supreme Court, which affirmed the appellate court's holdings on the issues of competency and ineffective assistance of counsel, but reversed as to the directed verdict and joinder issues. The Supreme Court reasoned that trial courts are permitted to direct a verdict against a defendant on the issue of mental disease or defect "if the judge finds there is no credible probative evidence toward meeting the burden of establishing the defense of not guilty by reason of mental disease or defect by a preponderance of the evidence after giving the evidence the most favorable interpretation in favor of the accused...." *State v. Leach,* 124 Wis.2d at 663, 370 N.W.2d at 249. The court went on to hold that, based on the evidence Leach presented at trial, "[n]o reasonable juror could conclude ... that the defendant suffered from any mental disease or defect, much less that he lacked substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law as a result of mental disease or defect." *Id.* at 667, 370 N.W.2d at 251. The Supreme Court also held that misjoinder is subject to harmless error analysis and that, in view of the "strong, uncontradicted evidence to support each crime charged," the improper joinder of the four complaints against Leach was, in fact, harmless error. *Id.* at 674, 370 N.W.2d at 254.

Having exhausted his state court remedies, Leach filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Wisconsin, reasserting the four allegations of error he had previously presented to the Wisconsin Court of Appeals and the Wisconsin Supreme Court. The district court denied Leach's petition, finding that his conviction in the Wisconsin courts had not been obtained in violation of his constitutional rights. On appeal, Leach maintains that he is entitled to a writ of habeas corpus, arguing that the Wisconsin courts violated his due process rights in directing a verdict for the state on the issue of insanity, permitting the joinder of the offenses charged in the four criminal informations, and requiring him to proceed to trial while he was suffering from amnesia, which allegedly rendered him incompetent to stand trial. Leach also contends that he was denied his sixth amendment right to effective assist-

---

**3.** The Court sentenced Leach as follows: thirteen years for the attempted murder of Stanley Blalock; a consecutive term of five years for the attempted armed robbery of David Watt; a consecutive ten-year sentence for the armed robbery of Gregory Greenwood; ten years' imprisonment for the armed robbery of Christine Guenther, to run concurrently with the sentence imposed for the Greenwood robbery; a consecutive sentence of ten years for the armed robbery of Dale Tech with a concurrent two-year term for Tech's false imprisonment; and a consecutive ten-year sentence for the armed robbery of Shang Yu Huei Lee.

ance of counsel due to his attorney's failure to request an instruction on endangering safety by conduct regardless of human life, a lesser included offense of the crime of attempted first-degree murder.

## II.

Leach argues that the trial court erred in directing a verdict in favor of the state on the issue of insanity in the second phase of his trial. As noted above, Leach entered pleas of not guilty and not guilty by reason of mental disease or defect, which, in Wisconsin, results in a bifurcated trial on the issues of guilt and insanity. After the jury found Leach guilty on all counts in the initial phase of the trial, the trial court, after hearing all of the defendant's witnesses and the state's decision not to offer testimony on this issue, directed a verdict for the state on the insanity question. Specifically, the court found that Leach had failed to present sufficient evidence upon which the jury could conclude that a mental disease or defect rendered Leach incapable of appreciating the nature and wrongfulness of his conduct or conforming his actions to the requirements of the law at the time of his commission of the charged offenses. Leach argues that the trial court, in directing a verdict on insanity, deprived him of his sixth amendment right to trial by jury on that issue.

Leach's initial contention is that, given Wisconsin's statutory scheme for trying the issues of guilt and insanity in separate stages of the criminal trial when pleas of not guilty and not guilty by reason of mental disease or defect are entered, trial courts in Wisconsin may not direct a verdict on the question of insanity because to do so would violate the constitutional prohibition against directing verdicts in criminal cases. *See Cole v. Young*, 817 F.2d 412, 425 (7th Cir.1987). The petitioner is correct in his assertion that in criminal trials, " 'a trial judge is prohibited from entering a

judgment of conviction or directing the jury to come forward with such a verdict ... regardless of how overwhelmingly the evidence may point in that direction.' " *Connecticut v. Johnson*, 460 U.S. 73, 84, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355–56, 51 L.Ed.2d 642 (1977)). "This rule stems from the Sixth Amendment's clear command to afford jury trials in serious criminal cases." *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986).[4] Thus, a criminal defendant "has an absolute right to a jury determination on *all essential elements* of the offense [charged in the indictment]." *United States v. England*, 347 F.2d 425, 430 (7th Cir.1965) (emphasis added).[5] *See also United States v. Goetz*, 746 F.2d 705, 708–09 (11th Cir.1984); *Belton v. United States*, 382 F.2d 150, 154 n. 9 (D.C.Cir. 1967).

The Wisconsin Supreme Court, however, has made clear that insanity is an affirmative defense and that a finding of insanity is dispositive only on the question of whether the accused is to be held criminally responsible for committing the charged offense; it is not determinative of whether the elements of the offense, and thus the criminal conduct itself, have been established. *State v. Koput*, 142 Wis.2d 370, 390–91, 418 N.W.2d 804, 812–13 (1988); *Steele v. State*, 97 Wis.2d 72, 96–97, 294 N.W.2d 2, 13 (1980).

"[T]he affirmative defense [of insanity] is of an entirely different nature from affirmative defenses utilized by defendants in the guilt phase, i.e., alibi, privilege, et cetera, which if proved result in an outright dismissal of the charge. Success on the affirmative defense of mental disease or defect does not have that result; rather, it is an affirmative defense to 'responsibility'—it relieves the person of the *sanctions* for criminal con-

---

**4.** The sixth amendment right to trial by jury is applicable to the states by virtue of the due process clause of the fourteenth amendment. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

**5.** Of course, a defendant waives his right to trial by jury by pleading guilty or *nolo contendere*. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969).

duct. It does not relieve the person already found guilty in the first phase of the factual finding of criminal conduct. Rather, the successful assertion of the affirmative defense in phase two results in a non-criminal sanction disposition. Thus, it is clear that phase two is not determinative of guilt in the sense of criminal conduct but only determinative of the disposition of the defendant in terms of the treatment to be afforded one who was insane at the time the guilty conduct was performed."

*Koput,* 142 Wis.2d at 388, 418 N.W.2d at 811–12 (emphasis in original). We, of course, are bound by the Wisconsin Supreme Court's interpretation of Wisconsin law. *See Hicks v. Feiock,* 485 U.S. 624, 108 S.Ct. 1423, 1428, 99 L.Ed.2d 721 (1988); *Davis v. Barber,* 853 F.2d 1418, 1421–23 (7th Cir.1988). Thus, because the insanity defense in Wisconsin is "not concerned with the elements of criminal conduct," *Koput,* 142 Wis.2d at 391, 418 N.W.2d at 813, we hold that the Wisconsin courts are not definitively prohibited by the sixth and fourteenth amendments from directing verdicts against criminal defendants on the issue of insanity. *See Williams v. Wainwright,* 712 F.2d 1375, 1376–77 (11th Cir. 1983). On the contrary, Wisconsin's rule permitting trial courts to direct a verdict on the insanity defense when there is insufficient evidence to create a jury question on this issue is in accord with the practice of a number of other state and federal courts, including this court, of withdrawing the issue of insanity from the jury under similar circumstances. *See United States v. Alden,* 767 F.2d 314, 320 (7th Cir.1984);

*United States v. Owens,* 854 F.2d 432, 435 (11th Cir.1988); *United States v. Jackson,* 587 F.2d 852, 854 (6th Cir.1978); *United States v. Bass,* 490 F.2d 846, 850 (5th Cir. 1974); *Blevins v. State,* 516 So.2d 914, 916 (Ala.Crim.App.1987); *Davis v. State,* 293 Ark. 472, 739 S.W.2d 150, 153–54 (1987); *Kleinbart v. United States,* 426 A.2d 343, 355 (1981), *vacated on other grounds,* 553 A.2d 1236 (D.C.1989); *Smith v. State,* 180 Ga.App. 278, 349 S.E.2d 26, 27 (1986); *People v. Moore,* 147 Ill.App.3d 881, 101 Ill. Dec. 377, 380–81, 498 N.E.2d 701, 704–05 (1986); *State v. Booth,* 169 N.W.2d 869, 871 (Iowa 1969); *State v. Allen,* 537 So.2d 1312, 1314 (La.Ct.App.1989); *Commonwealth v. Mattson,* 377 Mass. 638, 387 N.E.2d 546, 550 (1979); *State v. Neel,* 177 Mont. 93, 580 P.2d 456, 458–59 (1978); *State v. Valenzuela,* 90 N.M. 25, 32, 559 P.2d 402, 409 (1976); *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510, 536–37 (1979), *cert. denied,* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1137 (1980); *Walton v. State,* 744 P.2d 977, 979 (Okla.Crim.App.1987); *Commonwealth v. Plank,* 329 Pa.Super. 446, 478 A.2d 872, 874 (1984); *State v. Schaaf,* 727 S.W.2d 255, 258 (Tenn.Crim. App.1986); *State v. Kanaday,* 79 Wash.2d 647, 488 P.2d 1064, 1082 (1971), *vacated on other grounds,* 408 U.S. 940, 92 S.Ct. 2878, 33 L.Ed.2d 764 (1972).[6] Although these cases speak in terms of a trial court's refusal to instruct the jury on the issue of insanity, this court has recognized that a refusal to instruct and a directed verdict have the same result: removing the issue from the jury's consideration. *Cole,* 817 F.2d at 425. Thus, when a defendant fails

---

**6.** We reject Leach's attempt to distinguish these cases based on the fact that in Wisconsin the insanity defense is raised through a special plea of not guilty by reason of mental disease or defect. The Wisconsin Supreme Court has stated that "[t]he purpose of the [plea] requirement is to provide the prosecutor with advance notice that the defense will be raised." *State v. Leach,* 124 Wis.2d at 661, 370 N.W.2d at 248. This is very similar to the requirement in Fed.R. Crim.P. 12.2(a) that "[i]f a defendant intends to rely upon the defense of insanity at the time of the alleged offense, the defendant shall ... notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk." Despite this advance notice

requirement, the federal insanity defense remains, in all respects, an affirmative defense for which the accused has the burden of establishing a jury question in order to be entitled to a jury instruction thereon. *United States v. Owens, supra,* 854 F.2d at 434–35. Similarly, the *Leach* court made clear that Wisconsin's insanity defense is an affirmative defense and that the defendant has the burden of creating a jury question on this issue. *Leach,* 124 Wis.2d at 663, 370 N.W.2d at 248–49. Thus, we refuse to exalt form over substance and distinguish Wisconsin's insanity defense from similar defenses in other jurisdictions based merely on the fact that the defense is raised via a special plea.

to present sufficient evidence to sustain his assigned burden of proof under state law, he clearly has no right to have the insanity question submitted to the jury in the hope that they will acquit him based on sympathy, caprice, or compromise. *See Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) ("A defendant has no entitlement to the luck of a lawless decision maker...."). As the Supreme Court stated in *Patterson v. New York,* 432 U.S. 197, 206, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977): "[O]nce the facts constituting a crime are established beyond a reasonable doubt, ... the State may refuse to sustain the affirmative defense of insanity unless demonstrated by a preponderance of the evidence." Thus, the relevant inquiry becomes whether Leach presented sufficient evidence to create the jury question on his insanity defense.

■ In order to avail himself of an insanity defense under Wisconsin law, Leach was required to "establish to a reasonable certainty by the greater weight of the credible evidence" that "at the time of [committing criminal] conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law." Wis. Stat. § 971.15. The Wisconsin Supreme Court stated in this case that a directed verdict on insanity is appropriate "if the judge finds there is no credible probative evidence meeting the burden of establishing [insanity] ... by a preponderance of the evidence after giving the evidence the most favorable interpretation in favor of the accused asserting the defense." *State v. Leach,* 124 Wis.2d at 663, 370 N.W.2d at 249.[7] "Generally, in a habeas corpus action where the petitioner alleges constitutional error due to the trial court's refusal

to allow a defense instruction, the constitutional question is limited to whether the petitioner sufficiently alleges a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *United States ex rel. Stamps v. Hartigan,* 586 F.Supp. 1575, 1577 (N.D.Ill.1984) (quoting *United States ex rel. Peery v. Sielaff,* 615 F.2d 402, 404 (7th Cir.1979)). *See also Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). Given that a directed verdict and a refusal to instruct have the same result, *see supra,* we conclude that the trial court's action in directing a verdict on the issue of insanity should also be evaluated under the "fundamental miscarriage of justice" standard.

■ During the insanity phase of the trial, Leach introduced the testimony of two witnesses deemed qualified as expert witnesses by the trial court, Dr. Crowley and Dr. Smail. However, both of them stated that they could not determine whether Leach was suffering from a mental disease or defect at the time the defendant committed the various crimes. Although one of Leach's psychiatric evaluations contained a statement that there was "some evidence" of a schizophrenic thought disorder, the examining psychiatrist ultimately concluded that Leach was not mentally ill. Leach argues that the lack of a favorable expert opinion on the question of insanity is not determinative in this case because he introduced other evidence of mental disease or defect—namely, that he had attempted suicide on two occasions, that he had a "peculiar look" on his face when he shot his accomplice, Stanley Blalock, and that he suffered from amnesia, as well as periodic headaches, due to a previous head injury. However, this evidence falls far short of

---

7. We refuse to accept Leach's arguments that he was entitled to have the jury determine the issue of insanity merely by entering a plea of not guilty by reason of mental disease or defect or, in the alternative, by introducing "some evidence" of insanity. These are governed by state law and, thus, are not proper grounds for the granting of a writ of habeas corpus. In any case, it is clear from Wis.Stat. § 971.15 that Leach had to introduce evidence from which the jury could conclude "by the greater weight

of the credible evidence" that he was, in fact, insane at the time he committed the charged offenses. To the extent these arguments challenge the constitutionality of this burden of proof, we reject them in light of *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), and *Rivera v. Delaware,* 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976), in which the Supreme Court refused to invalidate statutes placing the burden of proving insanity on the defendant.

creating a jury question on the issue of insanity because it constitutes nothing more than speculation and conjecture. Leach failed to substantiate his claimed suicide attempts, despite the fact that he stated he was able to remember the hospital where he was treated, much less establish their relevance to his sanity at the time the crimes were committed.[8] Similarly, a "peculiar look" is hardly credible evidence of a mental disease or defect. Finally, Dr. Crowley testified that Leach's amnesia and headaches could have been signs of organic brain damage. Leach's electroencephalogram, however, revealed no organic brain damage. In any event, Leach failed to offer any evidence that his alleged headaches and amnesia prevented him from "appreciat[ing] the wrongfulness of his conduct or conform[ing] his conduct to the requirements of law." Thus, in view of the self-serving, unsubstantiated and largely irrelevant evidence Leach offered in support of his insanity defense, coupled with the inability of Leach's own experts to determine whether he was suffering from a mental disease or defect, we agree with the Wisconsin Supreme Court that Leach failed to meet the requisite burden of proving insanity and that no reasonable juror could conclude by a preponderance of the evidence that Leach was legally insane. We therefore hold that the trial court's decision to direct a verdict in favor of the state on Leach's insanity defense was not error at all, much less a "fundamental miscarriage of justice."

### III.

■ Leach next contends that the joinder of the charges in the four informations was improper and that, as a result of the misjoinder, he was deprived of his right to a fair trial. The state concedes that joinder of the offenses was improper under Wis. Stat. § 971.12,[9] but argues that Leach was not prejudiced thereby and, thus, is not entitled to habeas relief on this basis. Initially, we note that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder ... rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his ... right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725, 730 n. 8, 88 L.Ed.2d 814 (1986). Because "[o]nly constitutional error is a ground" for the issuance of a writ of habeas corpus, Bell v. Duckworth, 861 F.2d 169, 170 (7th Cir.1988) (emphasis in original), we are concerned only with whether the misjoinder under Wisconsin law deprived Leach of his federal constitutional right to a fair trial. See Willard v. Pearson, 823 F.2d 1141, 1149 (7th Cir. 1987).

As noted above, the charges against Leach were premised on four distinct episodes of criminal activity: (1) the attempted murder of Stanley Blalock on January 8, 1982; (2) the armed robbery of Gregory Greenwood and his three companions on January 29, 1982; (3) the armed robbery and false imprisonment of Dale Tech and the armed robbery of Shang Yu Huei Lee at the North Shore Inn on February 6, 1982; and (4) the attempted armed robbery of David Watt at the Park Avenue Nightclub on February 8, 1982. The prosecution presented its case concerning each incident

---

8. Thus, Leach provided the court with neither the dates of his alleged treatment nor the hospital records describing what treatment, if any, he actually received.

9. Wis.Stat. § 971.12 provides, in pertinent part:

"(1) Joinder of Crimes. Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected

together or constituting parts of a common scheme or plan. When a misdemeanor is joined with a felony, the trials shall be in the court with jurisdiction to try the felony.

\* \* \* \* \* \*

(4) Trial Together of Separate Charges. The court may order 2 or more complaints, informations or indictments to be tried together if the crimes and the defendants, if there is more than one, could have been joined in a single complaint, information or indictment. The procedure shall be the same as if the prosecution were under such single complaint, information or indictment."

separately and in chronological order.[10] Thus, although all of the charged offenses were tried in the same proceeding, the jury had the benefit of hearing all of the evidence as to one complete episode of criminal activity before being presented with evidence of another.[11] Given that the charged offenses occurred on different dates, in different localities and involved different victims, we are of the opinion that the likelihood of jury confusion as to what evidence related to which count is nigh unto impossible.

Nonetheless, Leach argues that "[j]oinder in this case created a considerable risk that the jury would use the cumulative weight of the evidence to conclude that [he] was a bad person, predisposed to committing crimes." From our review of the record, we are convinced that the risk, if any, was at best negligible, and the defendant has presented nothing to convince us otherwise. The trial court gave the following clear, unambiguous and limiting instruction in its final charge to the jury during the guilt phase of the trial: "You must make a finding of guilt or innocence as to each crime charged. Each is to be considered separately. The defendant's guilt or innocence on any one of the crimes charged must not affect your verdict on any other crime charged." Moreover, the state presented overwhelming evidence of guilt on each of the charged offenses. Leach argues that the prosecution's evidence was weak on the questions of Leach's intent to kill Blalock, an element of

the crime of attempted first-degree murder, and the identification of Leach as the perpetrator of the armed robberies of January 29 and February 6, 1982. We disagree.

Blalock testified that Leach, after accusing him of absconding with proceeds from a burglary they had committed, followed him to his car and shot him in the back. When Blalock asked Leach what he was doing, Leach responded, "You know what I am doing." Leach shot Blalock two more times, once in the shoulder and once in the hip, before Blalock escaped to a nearby house. As a result of his bullet wounds, Blalock was hospitalized for two weeks. His attending physicians decided not to remove the bullet in his back because it was lodged dangerously close to his aorta, the artery leading to his heart. Based on this evidence, we have no doubt as to Leach's intent to kill Blalock. As the Supreme Court stated in *Hopper v. Evans*, 456 U.S. 605, 613, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982):

> "It would be an extraordinary perversion of the law to say that intent to kill is not established when a felon ... admits to shooting his victim in the back.... The evidence not only supported the claim that [the defendant] intended to kill the victim, but affirmatively negated any claim that he did not intend to kill the victim." [12]

Considering that Leach aimed the weapon at Blalock's back, fired the gun three times at his body and directed the path of the bullet dangerously close to the victim's

---

**10.** As the Wisconsin Supreme Court observed: "First, the prosecutor presented all the evidence with respect to the attempted murder of Stanley Blalock. When all relevant evidence to that charge was completed, the prosecutor presented all the witnesses to the robbery and related crimes on Milwaukee's far northwest side oh January 29, 1982. Next, the witnesses to the robbery and related crimes committed [at the North Shore Inn] on February 6, 1982, were presented. Finally, all the witnesses to the attempted robbery of [the Park Avenue Nightclub] in which he was apprehended were presented."
*State v. Leach*, 124 Wis.2d at 673, 370 N.W.2d at 253.

**11.** We note that Leach's presentation of evidence did not detract from the prosecution's

careful "compartmentalization" of the evidence. Leach presented only a character witness who did not testify in reference to the evidence of criminal conduct presented by the prosecution.

**12.** Although Leach did not make a formal statement or testify during trial that he shot Blalock in the back, Leach never disputed this point and argued only that he did not form the requisite intent to kill Blalock. We do not view Leach's claimed amnesia as the reason that intent to kill was the only defense to the attempted murder charge. Although Leach told Dr. Crowley that he could not remember committing any of the charged offenses, he described his version of the Blalock shooting to one of the examining psychiatrists at Central State Hospital.

heart (aorta), we reject Leach's argument that the prosecution's evidence on intent to kill was not overwhelming.

The arguments concerning the identification of Leach as the perpetrator of the armed robberies are similarly unavailing. All three of the witnesses to the armed robbery at the North Shore Inn on February 6, 1982, identified Leach as the robber, both at trial and at a pretrial lineup. In addition, Gregory Greenwood, Joanne Guenther and Christine Guenther, three of the four victims of the armed robbery of January 29, 1982, identified Leach in a pretrial lineup, as well as at trial. We decline Leach's invitation to hold that the inability of Michael Olson, the fourth victim of the January 29 armed robbery, to identify Leach as the perpetrator renders the prosecutor's identification evidence less than overwhelming. Leach conveniently ignores the fact that, despite Olson's failure to identify Leach, Olson identified Leach's gun, which had a distinctive white handle, as the weapon used by the man who robbed him.[13] Based upon all of these facts set forth at trial, we reject Leach's challenge to the prosecution's identification evidence as well.

Our review of the record convinces us that the evidence of Leach's guilt on each of the charged offenses was overwhelming. Coupled with the trial court's explicit limiting instruction that the jury was required to determine Leach's guilt or innocence on each count without reference to his guilt or innocence on the other charged counts, we hold that Leach has failed to establish any prejudice resulting from the misjoinder of the charged offenses, let alone "prejudice so great as to deny [the] defendant his ... right to a fair trial."

## IV.

Leach raises two additional arguments in support of his petition for a writ of habeas corpus: that he was incompetent to stand trial due to his amnesia, and that he was denied effective assistance of counsel due to his trial attorney's failure to request an instruction on the crime of endangering safety by conduct regardless of life. These arguments are without merit.

■ It is well settled that "[a] defendant has the due process right not to be tried while incompetent." *United States ex rel. Bilyew v. Franzen*, 842 F.2d 189, 192 (7th Cir.1988). "The due process test is 'whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *United States ex rel. Mireles v. Greer*, 736 F.2d 1160, 1165 (7th Cir.1984) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960)). In its court-ordered competency evaluation of the defendant, the examining psychiatrist for the Wisconsin Department of Health and Social Services, based on his examination of the defendant, found that Leach "is cognizant of the workings of the court system and the roles that the major participants play." Based on this finding, which Leach has not challenged at any stage of this case, the psychiatrist concluded that Leach was able to understand the nature of the proceedings against him and, thus, was competent to stand trial. Nonetheless, Leach argues that due to his alleged amnesia, he was unable to assist in his defense. However, "amnesia is not a bar to prosecution of an otherwise competent defendant." *United States v. Stevens*, 461 F.2d 317, 320 (7th Cir.1972). *Accord Davis v. Wyrick*, 766 F.2d 1197, 1202 (8th Cir.1985); *Holmes v. King*, 709 F.2d 965, 968 (5th Cir.), *cert. denied*, 464 U.S. 984, 104 S.Ct. 428, 78 L.Ed.2d 362 (1983); *United States ex rel. Parson v. Anderson*, 481 F.2d 94, 96 (3d Cir.), *cert. denied*, 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479 (1973); *United States v. Knohl*, 379 F.2d 427, 436 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Because amnesia, the only theory Leach asserts in support of his incompetency

---

**13.** The gun was confiscated from Leach at the time of his arrest at the Park Avenue Nightclub on February 8, 1982.

claim, is not a proper basis for a finding that a defendant is incompetent to stand trial, we agree with the trial court that there was no evidence of mental disease or defect to support a finding that Leach was unable to consult with his lawyer and prevented him from having a rational, as well as factual, understanding of the proceedings against him. Thus, we reject Leach's argument that he was forced to proceed to trial in violation of his right to due process.

■ We also reject Leach's contention that defense counsel's performance was constitutionally ineffective due to the attorney's failure to request a jury instruction on the crime of endangering safety by conduct regardless of life, a lesser included offense of the crime of attempted murder. In order to establish a claim of ineffective assistance of counsel, Leach must demonstrate that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and that "there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068. We need not determine whether counsel's failure to request the lesser included offense instruction was objectively unreasonable because, even if it were, Leach has failed to demonstrate a reasonable probability that the jury would not have convicted him of attempted first-degree murder had such an instruction been given. Under Wisconsin law, "[t]he distinguishing element between attempted first-degree murder and endangering safety by conduct regardless of life is the defendant's intent to kill the victim." *Walker v. State*, 92 Wis.2d 690, 693, 286 N.W.2d 2, 4 (Ct.App.1979), *aff'd*, 99 Wis.2d 687, 299 N.W.2d 861 (1981). We have previously determined in this opinion that the prosecution's evidence on the attempted murder charge was overwhelming, effectively precluding *any* doubt, let alone a reasonable doubt, that Leach did not intend to kill Stanley Blalock. Thus, even if defense counsel had proffered an instruction on endangering safety by conduct regardless of life and the trial court had given the instruction in its charge to the jury, we are convinced that the jury would have nonetheless convicted Leach of the greater crime of attempted murder as the evidence of guilt of attempted murder was overwhelming. Accordingly, we hold that Leach has failed to demonstrate that his attorney's performance was constitutionally ineffective and reject his argument that his sixth amendment rights were violated.

V.

Leach has failed to establish that his conviction in the Wisconsin state courts was obtained in violation of his constitutional rights. The district court's denial of Leach's petition for a writ of habeas corpus is

AFFIRMED.